COURT
OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
NO. 2-01-347-CV
 
FRAUD-TECH, INCORPORATED, DEAN       
           
           
        APPELLANTS
MCGEE AND ROBERT ANDREWS
V.
CHOICEPOINT, INC. F/K/A DATABASE       
           
           
        APPELLEES
TECHNOLOGIES, INC., THE INFORMATION
CONNECTIVITY GROUP, INC., THOMAS H.
HOOLIHAN, PHILLIP WAMOCK, AND
ANDREW PERLMUTTER
------------
FROM THE 67
TH DISTRICT COURT OF TARRANT
COUNTY
------------
OPINION
------------
This is a commercial dispute between
Appellants Fraud-Tech, Inc. ("FTI"), Dean McGee, and Robert Andrews
and Appellees ChoicePoint, Inc. f/k/a Database Technologies, Inc. ("DBT"),
The Information Connectivity Group, Inc. ("ICON"), Thomas H. Hoolihan,
Phillip Wamock, and Andrew Perlmutter involving the joint development of FTI's
idea and concept of a fraud detection system for the mortgage industry. FTI,
McGee, and Andrews appeal from the trial court's summary judgment, which was
granted on Appellees' motion. We affirm in part and reverse and remand in part.
I. Factual and Procedural
Background
DBT is a Florida-based software
development company that, among other services, provides tracking software to
law enforcement agencies and insurance investigators. McGee and Andrews, who
were both residents of Texas, approached DBT in the spring of 1998, proposing
that the parties jointly develop and market a mortgage fraud detection system
for the mortgage banking industry, in which mortgage banking companies could
determine the legitimacy of information provided in a potential borrower's loan
application. McGee and Andrews formed FTI, a Texas corporation, to facilitate
the business transactions with DBT.
On March 4, 1998, Andrews, individually,
entered into a nondisclosure agreement with DBT. Under the terms of the
agreement, both parties agreed that they would not disseminate or use the
other's confidential information for competitive purposes or for any other
purpose "not in furtherance of the business relationship between
them." The nondisclosure agreement also provided that, in the event of a
breach or a threatened breach by either party, the "non-breaching party
will have no adequate remedy in money damages and, accordingly, shall be
entitled to seek an injunction against such breach." The non-breaching
party was additionally entitled under the agreement to "any other legal or
equitable remedies available to it."
On June 9, 1998, FTI and DBT executed a
letter of intent outlining the terms of a proposed transaction whereby FTI and
DBT would jointly develop and market mortgage fraud detection software. The
letter of intent also provided that the terms of the nondisclosure agreement
entered into by the parties on March 4, 1998 would remain in full force and
effect until negotiations between the parties yielded a legally binding
agreement. FTI and DBT continued to work together pursuant to the letter of
intent and negotiated a draft licensing agreement. Ultimately, however, the
parties never consummated the agreement contemplated by the letter of intent.
FTI filed suit on November 2, 1998 against
Appellees, alleging that on October 1, 1998, Wamock and Perlmutter contacted FT
Mortgage Company, a large lending institution, at its Dallas office. Wamock and
Perlmutter represented to FT Mortgage that they were representatives of ICON,
which was affiliated with DBT. Wamock and Perlmutter stated that they were
interested in discussing FT Mortgage's interest in a new software concept being
developed by DBT. FTI's petition further alleged that on October 8, 1998, Wamock
and Perlmutter met with representatives of FT Mortgage at the Dallas office and
disclosed that DBT and ICON were developing a system that would be used during
the loan application process to detect and identify fraud. Appellees answered
and on November 12, 1998, the court entered an agreed temporary injunction,
which was subsequently extended.
Appellees later filed a document titled
"Defendants' Original Cross-Claim" on August 2, 1999 against Andrews
and McGee, seeking temporary and permanent injunctive relief. On August 26,
1999, Andrews and McGee filed their original answer to Appellees' cross-claim.
In its fifth amended petition, filed
August 28, 2000, FTI sought injunctive relief, as well as damages for fraud,
conversion, breach of fiduciary duty, civil conspiracy, breach of the
nondisclosure agreement, breach of the letter of intent, and breach of the
application development, distribution, and license agreement ("licensing
agreement"). FTI sought to prove through expert testimony that its initial
investment of $10,000 in the system would have grown to $17,648,000 within five
years. FTI also requested the remedy of specific performance on these
agreements.
On October 2, 2000, Andrews and McGee
filed their first amended answer and counterclaim to Appellees' cross-claim. The
pleading included the following statement: "Cross-Defendants adopt,
individually and collectively, and incorporate by reference each and every
allegation and cause of action set forth in Plaintiff's Original Petition and
each and every amendment and/or supplement thereof and/or thereto as if set
forth herein at length verbatim."
On May 15, 2001, Appellees sought a motion
for summary judgment against FTI, under rule 166a of the Texas Rules of Civil
Procedure, seeking judgment as a matter of law on FTI's claims for breach of
contract and civil conspiracy. Appellees also sought a no-evidence motion for
summary judgment, pursuant to rule 166a(i), on the grounds that there was no
evidence to support FTI's claims for breach of contract, fraud, civil
conspiracy, breach of fiduciary duty, and conversion. Along with their dual
motion for summary judgment, Appellees filed a motion to exclude the testimony
of FTI's damages experts, Dean McGee, Dr. J. Herbert Burkman, and J. Richard
Claywell.
Subsequently, on June 8, 2001, FTI filed
its sixth amended petition, in which it withdrew its claims for breach of
fiduciary duty and civil conspiracy and added a claim for breach of a contract
implied in law regarding the licensing agreement. Appellees, however, did not
amend their dual motion for summary judgment. FTI then filed a notice of partial
nonsuit with prejudice as to its claims against Appellees Hoolihan, Wamock, and
Perlmutter, and the trial court entered an order granting the nonsuit on June
20, 2001. The trial court later granted the remaining defendants' (Appellees
ICON and DBT) motion to exclude FTI's damages experts on July 2, 2001 and their
motion for summary judgment on July 24, 2001.
Because the parties were concerned with
the finality of the summary judgment, the trial court received and reviewed
post-judgment briefing from both sides and conducted a hearing to determine
whether the judgment disposed of all parties and claims. On August 8, 2001, the
trial court entered a final summary judgment, which indicated the court's intent
to dispose of all claims and all parties. The summary judgment stated, in
pertinent part:

 It is, therefore,
 ORDERED, ADJUDGED, AND DECREED that
 Defendants' counterclaims against Plaintiff Fraud-Tech, Inc. and/or its two
 shareholders, Robert Andrews, Individually ("Andrews"), and Dean
 McGee, Individually ("McGee"), are non-suited without prejudice to
 re-filing of same pursuant to Defendants' notice of non-suit made in open
 court; it is, further,
 ORDERED, ADJUDGED, AND DECREED that the
 only claims and parties remaining after Defendants' non-suit are Plaintiff
 Fraud-Tech's claims against Defendants by virtue of Plaintiff's Sixth Amended
 Original Petition filed on June 8, 2001 in which the counterclaims of Andrews
 and McGee were voluntarily dismissed; it is, further,
 ORDERED, ADJUDGED, AND DECREED that
 Defendants are awarded final summary judgment against Plaintiff Fraud-Tech,
 Inc.

This appeal arises from this final summary
judgment.
II. Legal Analysis
On appeal, McGee and Andrews argue that
the trial court erred in granting summary judgment because: (1) FTI's sixth
amended petition did not amend away McGee and Andrews's counterclaims against
Appellees; (2) the trial court's judgment cannot be affirmed on any other legal
theories; (3) Appellees waived any complaint about the sufficiency of McGee and
Andrews's counterclaims; and (4) the trial court erroneously ruled that McGee
and Andrews's counterclaims had been voluntarily dismissed.
Additionally, FTI complains that the trial
court erred in granting summary judgment because: (1) the trial court granted
summary judgment on issues not presented to it during the summary judgment
hearing; (2) the judgment granted more relief than Appellees requested, in that
Appellees' motion for summary judgment did not address FTI's claims for specific
performance or breach of a contract implied in law; (3) FTI raised a genuine
issue of material fact with respect to its claims for damages; (4) the judgment
was based on an erroneous decision to exclude FTI's expert witnesses on damages;
and (5) FTI raised genuine issues of material fact on its claims of breach of
contract, fraud, and conversion.
A. Standard of Review
1. Traditional Motion for Summary
Judgment
In a summary judgment case, the issue on
appeal is whether the movant met his summary judgment burden by establishing
that no genuine issue of material fact exists and that the movant is entitled to
judgment as a matter of law. (1) The burden of
proof is on the movant, and all doubts about the existence of a genuine issue of
material fact are resolved against the movant. (2)
Therefore, we must view the evidence and its reasonable inferences in the light
most favorable to the nonmovant. (3)
In deciding whether there is a material
fact issue precluding summary judgment, all conflicts in the evidence are
disregarded and the evidence favorable to the nonmovant is accepted as true.
(4) Evidence that favors the movant's position will not be considered
unless it is uncontroverted. (5) The summary
judgment will be affirmed only if the record establishes that the movant has
conclusively proved all essential elements of the movant's cause of action or
defense as a matter of law. (6)
A defendant is entitled to summary
judgment if the summary judgment evidence establishes, as a matter of law, that
at least one element of a plaintiff's cause of action cannot be established.
(7) The defendant as movant must present summary judgment evidence
that negates an element of the plaintiff's claim. Once the defendant produces
sufficient evidence to establish the right to summary judgment, the burden
shifts to the plaintiff to come forward with competent controverting evidence
raising a genuine issue of material fact with regard to the element challenged
by the defendant. (8) When the summary judgment
order does not include the specific grounds for the ruling, the judgment may be
affirmed on any meritorious theory presented in the motion.
(9)
2. No-Evidence Motion for Summary
Judgment
After an adequate time for discovery, the
party without the burden of proof may, without presenting evidence, move for
summary judgment on the ground that there is no evidence to support an essential
element of the nonmovant's claim or defense. (10)
The motion must specifically state the elements for which there is no evidence.
(11) The trial court must grant the motion unless the nonmovant
produces summary judgment evidence that raises a genuine issue of material fact.
(12)
A no-evidence summary judgment is
essentially a pretrial directed verdict, and we apply the same legal sufficiency
standard in reviewing a no-evidence summary judgment as we apply in reviewing a
directed verdict. (13) We review the evidence in
the light most favorable to the party against whom the no-evidence summary
judgment was rendered, disregarding all contrary evidence and inferences.
(14) If the nonmovant brings forward more than a scintilla of
probative evidence that raises a genuine issue of material fact, then a
no-evidence summary judgment is not proper. (15)
B. McGee and Andrews's Appeal
McGee and Andrews raise four issues on
appeal, complaining generally about the trial court's summary judgment entered
against them. Before we address McGee and Andrew's appeal, however, we first
clarify the status of individual Appellees Hoolihan, Wamock, and Perlmutter.
During oral argument, Appellees' counsel expressed his view that these three
individuals were not Appellees because FTI nonsuited its claims against them. We
note, however, that while Hoolihan, Wamock, and Perlmutter are not appellees as
to FTI's appeal, they are appellees as to the claims asserted by McGee and
Andrews, which were not disposed of by virtue of the order on FTI's
notice of partial nonsuit. Thus, we address McGee and Andrews's appeal as to all
Appellees.
In their first issue, McGee and Andrews
argue that the trial court erred in granting summary judgment as to McGee and
Andrews because FTI's sixth amended petition did not amend away their
counterclaims against Appellees. Following the trial court's initial entry of
summary judgment, the court considered arguments concerning its judgment and
entered a modified summary judgment to ensure that the order was final and
appealable. The modified summary judgment expressly indicated that McGee and
Andrews's counterclaims were voluntarily dismissed by virtue of FTI's sixth
amended petition.
FTI is a corporate entity, separate and
apart from its officers and shareholders. (16)
While FTI was a party to the litigation at the time Appellees filed their
"Original Cross-Claim" against McGee and Andrews, neither McGee nor
Andrews were parties to the litigation. Therefore, Appellees' Original
Cross-Claim against McGee and Andrews is substantively a third-party petition,
as it sought relief against persons who were not parties to the litigation.
(17) Because we have determined that Appellees' claims against McGee
and Andrews are in the nature of a third-party action, the proper focus of our
inquiry is on the pleadings between Appellees and McGee and Andrews, not, as
Appellees contend, on the pleadings between Appellees and FTI.
Appellees assert that FTI's sixth amended
petition, which contains no references or allegations concerning McGee and
Andrews as parties to the litigation, amended away the counterclaims of McGee
and Andrews. Specifically, Appellees argue that the counterclaims were dismissed
because: (1) neither McGee nor Andrews was listed as a party as required under
rule 79 of the Texas Rules of Civil Procedure; (2) no allegations were made on
behalf of either McGee or Andrews; and (3) the style of the case did not
reference either McGee or Andrews, but rather a singular "Plaintiff."
Although Appellees direct us to a few of
the many cases concerning dismissal by an amended pleading, we agree with McGee
and Andrews that those cases are distinguishable from the case at bar. Appellees
set forth the general rule that "[p]arties to a suit are just as
effectively dismissed from a suit by omitting their names from an amended
pleading as where a formal order of dismissal is entered."
(18)
The classic example of this rule's
operation is shown in Mecure, in which Century sued Rowland and Keim
for unpaid rent. (19) Initially, Century
asserted its right to sue the two defendants in its own name, rather than as an
agent for Mecure. (20) In an amended pleading,
the plaintiff was designated as "Mecure Company, N.V., by its agent Century
Development Corporation." (21) In its
fourth amended pleading, however, "the name of Century was dropped as a
party and the plaintiff's name designated as Mecure Company, N.V."
(22) The court held that when Century's name was dropped from the
plaintiff's fourth amended petition, the intentional omission of its name from
the pleading effectively dismissed Century from the suit.
(23) All of the cases applying this dismissal rule follow in similar
fashion. (24)
None of these cases, however, provide
support for the trial court's ruling as to McGee and Andrews in this case, as
these cases do not stand for the proposition that the amended pleading of a
plaintiff can effectively dismiss the claims and/or counterclaims between a
third-party plaintiff and a third-party defendant. As to the claims between
Appellees and McGee and Andrews, their pleadings were never amended to drop any
of the named parties.
Accordingly, we hold that the trial court
erroneously ordered that FTI's sixth amended petition voluntarily dismissed
McGee and Andrews's counterclaims. While Appellees' brief voices their
confidence that there is no point in reversing the summary judgment only as to
McGee and Andrews's counterclaims, a situation they seemingly set in motion with
their purported Original Cross-Claim, we cannot affirm the trial court's summary
judgment with respect to McGee and Andrews because Appellees only moved for
summary judgment against FTI. (25) Given our
holding that the trial court erred in dismissing their counterclaims, we sustain
McGee and Andrews's first issue. We need not address McGee and Andrews's
remaining issues. (26)
C.
FTI's Appeal
In five issues, FTI
argues that the trial court erred in granting summary judgment. Before we reach
these contentions, we address Appellees' arguments concerning the timeliness of
FTI's response to Appellees' motion for summary judgment and the law governing
the claims in this case.
1. Timeliness of FTI's Summary
Judgment Response
Appellees first argue that we can affirm
the summary judgment because FTI's response to the defendants' motion for
summary judgment was untimely filed. Appellees contend that we should
conclusively presume that FTI's late-filed response was not considered by the
trial court because nothing appears of record to indicate that the late filing
of FTI's response was with leave of court. We disagree.
Generally, rule 166a requires a response
to a motion for summary judgment to be filed at least seven days before the
hearing on the motion. (27) In this case, the
summary judgment hearing was set for June 15, 2001. Accordingly, FTI's response
was due on or before Friday, June 8, 2001. (28)
FTI did not file its response until Monday, June 11, 2001; however, Appellees
conceded at the summary judgment hearing and in their brief to this court that
the parties signed and filed a written Rule 11 agreement, giving FTI until June
11 to file its response.
Neither of the cases cited by Appellees
holds that a Rule 11 agreement cannot extend a summary judgment deadline unless
a party also receives additional leave of court. (29)
In fact, both Goswami and Gilchrist are distinguishable from
the case at bar because neither addresses whether a Rule 11 agreement can extend
the deadline for filing a summary judgment response. (30)
Rather, parties may alter the deadline for filing a response by Rule 11
agreement. (31) We hold that FTI's response was
properly before the trial court.
2. Choice of Law
We must also address the choice of law
issues raised by FTI before considering FTI's appeal. FTI argues that Florida
law governs all three purported contracts. Appellees, on the other hand, argue
that choice of law is not an issue in this appeal because the court may assume
that Florida and Texas law are the same since FTI has not articulated a
difference.
The three purported agreements that form
the basis for FTI's contractual claims each contain a choice of law clause. The
nondisclosure agreement states that it is to be governed by Delaware law, while
the letter of intent and the licensing agreement both state that they are to be
governed under Florida law. Additionally, the letter of intent purports to
incorporate by reference the nondisclosure agreement.
Before undertaking a choice of law
analysis, we look to whether a conflict of law exists.
(32) If no conflict of law exists on the issues, we need not decide
which state's law applies. (33) Nothing appears
in the record indicating which state's law the trial court applied, nor does
either party argue that the trial court applied the wrong law.
We note that despite FTI's argument that
Florida law applies to its contract claims, during all stages of this
litigation, FTI has consistently sought application of Texas law with respect to
the recovery of lost profits damages. For example, FTI's response to Appellees'
motion to exclude FTI's damages experts only cites Texas law and states,
"The amount of claimed lost profits must be shown by competent evidence
with reasonable certainty." (34) Likewise,
in its appellate brief, FTI urges this court, under the heading "Applicable
Law," that Texas Instruments governs with respect to the recovery
of lost profits. (35) Because FTI did not plead,
prove, or otherwise avail itself of Florida law with respect to the recovery of
lost profits, we assume there is no difference between the law of Florida and
Texas concerning the recovery of lost profits, and we apply Texas law.
(36)
Moreover, as discussed below, FTI has not
shown a difference between Texas and Florida law concerning the dispositive
issues in its appeal. We, therefore, need not decide the choice of law issues
raised by FTI because there is no conflict of law on the issues presented by FTI.
(37)
3. Issues Submitted at the Summary
Judgment Hearing
FTI complains in its first issue that the
trial court erred in granting summary judgment on issues not submitted to the
court during the summary judgment hearing. First, FTI states that there was no
hearing. Second, FTI claims that, even if there was a summary judgment hearing,
the court committed reversible error because the only issue submitted during the
hearing concerned damages.
The record clearly indicates that on June
15, 2001, the trial court conducted a hearing on Appellees' motion to exclude
FTI's damages experts and on Appellees' motion for summary judgment. The court
also heard further arguments concerning Appellees' motion to exclude on June 28,
2001. During the hearing FTI's counsel stated:

        
 [W]ith regard to the motion for summary judgment, it's my understanding . . .
 that the only issue they were moving on, in essence, or attacking was the
 issue of damages. And, of course, they'll correct me if I'm wrong. So that if
 you excluded the expert's testimony, i.e., in reliance -- to rely on damages,
 then, in essence it ix-nays that element of our causes of action, and then is
 the grant of summary judgment.
        
 . . . .
        
 Am I mistaken in what I think where we're at in this?

In response, the court and Appellees'
counsel replied:

        
 THE COURT: Well, but he's got [Hoolihan, Wamock, and Perlmutter].
        
 [APPELLEES' COUNSEL]: Except for the three individuals.

As FTI points out in its brief, the
ensuing discussion centered largely on these three individual defendants. FTI
claims that it never agreed to submit the entire motion for summary judgment to
the trial court for ruling without a hearing and also that nothing in the record
indicates that the trial court intended to take such action.
To preserve a complaint for our review, a
party must have presented to the trial court a timely request, objection, or
motion that states the specific grounds for the desired ruling, if they are not
apparent from the context of the request, objection, or motion.
(38) If a party fails to do this, error is not preserved, and the
complaint is waived. (39) The objecting party
must get a ruling from the trial court. This ruling can be either express or
implied. (40)
Here, FTI did not object at the summary
judgment proceeding to the scope of issues submitted and raised the issue for
the first time in its motion to modify judgment and for new trial, filed after
the court entered the modified summary judgment. Appellees correctly point out
that while rule 166a(c) of the Texas Rules of Civil Procedure calls for a
hearing on a motion for summary judgment, the Texas Supreme Court has stated
that an oral hearing is not mandatory. (41) Even
so, we do not address FTI's contention on this issue because we hold that FTI
waived the right to complain of any error regarding the scope of issues
submitted at the summary judgment hearing by failing to make a timely objection.
(42) We overrule FTI's first issue.
4. Exclusion of FTI's Expert
Testimony on Damages
In its third and fourth issues, FTI
complains that the trial court erred in granting summary judgment because the
judgment was based on the erroneous decision to exclude FTI's expert testimony
on damages, which FTI contends raises a genuine issue of material fact on the
issue of damages. Appellees respond that the trial court properly excluded FTI's
expert testimony on damages, which left FTI without any evidence of damages as
to its causes of action. We agree that the trial court did not abuse its
discretion in excluding FTI's expert testimony on damages.
In their no-evidence motion for summary
judgment, Appellees, in part, moved for summary judgment as to FTI's
contractual, fraud, and conversion claims on the ground that there was no
evidence of damages. On the same day on which they filed their dual motion for
summary judgment, Appellees also filed a motion to exclude FTI's damages
experts. As part of their motion to exclude, Appellees attached the affidavit of
their own expert Marta McCall. FTI's response to Appellees' no-evidence motion
for summary judgment included only two paragraphs regarding the alleged injury
suffered:
V. Fraud

        
 . . . .


 
 Injury
 


        
 4.16 An injury is suffered when a legal liability or obligation is incurred
 that is different from the one represented or contracted for. [FTI] was
 represented that its confidential information would remain its own property
 and that such confidential information would not be used by DBT for the
 purposes of competing with [FTI]. Additionally, [FTI] was represented that it
 would be the exclusive distributor of its product to the mortgage industry.
 Because of these misrepresentations, Plaintiff has suffered economic damages
 in the amount of $17,648,000.00.
        
 4.17 These damages are evidenced by Dr. Burkman who is an economist, with a
 background in corporate economic analysis, academic instructions and research.
 His testimony will evidence the valuation of Plaintiff's business, product,
 and services, its marketability and the existing market and demand for such
 product during the time period made the basis of Plaintiff's claims, had
 Defendants performed their representations as promised. The documents relied
 upon by Dr. Burkman and his expert report evidence the injury caused to
 Plaintiff.

(footnotes omitted).
As summary judgment evidence, FTI attached
Dr. Burkman's expert report, which incorporated J. Richard Claywell's expert
report, which was based, in part, on information provided by Appellant McGee,
who FTI also proffered as an expert in mortgage fraud. Dr. Burkman opined:

        
 Using regression analysis to forecast the average number of loans between 1999
 and 2003, the expected penetration of the mortgage loan market by Fraud-Tech,
 and consequently, the expected number of loans served by its fraud management
 system, the Claywell report conservatively concludes that over this five year
 period the company can expect to lose $17,648,000.

Claywell's expert report likewise stated,
"In my expert opinion, [FTI] has suffered $17,648,000 in damages as a
result of the alleged allegations in this suit."
FTI asserts that Claywell's report lists
one entry for lost profits ($10,638,966) and another figure for the value of FTI
as a business after five years ($7,008,621). As a result, FTI contends that
Appellees have only challenged lost profits damages and not valuation of the
business, a distinction, which FTI claims, allows it to circumvent Appellees'
motion to exclude as to damages related to business value. FTI concedes,
however, that Dr. Burkman testified that the amount of lost profits is a factor
which goes into valuing a business. (43)
Assuming this to be true, if FTI fails to meet its evidentiary burden with
respect to its claimed lost profits damages, FTI's expert testimony will
likewise be unable to establish the damages based on the projected value of the
business.
As part of its response to Appellees'
motion to exclude, FTI attached the affidavit of Dean McGee, which was sworn and
subscribed to two days before FTI filed the response. After reviewing the
pleadings and evidence filed, and after conducting two hearings on Appellees'
motion to exclude FTI's damages experts, the court granted Appellees' motion to
exclude McGee, Claywell, and Dr. Burkman.
a. Law Governing Expert Opinion
Evidence
For an expert's testimony to be admissible
under Texas Rule of Evidence 702, the party offering the expert's testimony
bears the burden of proving that the witness is qualified, that the expert's
opinion is relevant to the issues in the case, and that the opinion is based
upon a reliable foundation. (44) We review a
trial court's exclusion of expert testimony under an abuse of discretion
standard. (45) The exercise of discretion is
within the sole province of the trial court, and this court may not substitute
its discretion for that of the trial court. (46)
A trial court abuses its discretion when its ruling is arbitrary, unreasonable,
or without reference to any guiding rules or legal principles.
(47) Because the trial court did not specify the ground on which it
excluded FTI's expert testimony on damages, we will affirm the trial court's
ruling if any ground is meritorious. (48)
1 b. Law Governing Evidence of Lost
Profits Damages
A party seeking recovery for lost profits
must prove those profits by competent evidence with reasonable certainty.
(49) The Texas Supreme Court has emphasized that the requirement that
lost profits be proved with reasonable certainty is intended to be flexible
enough to accommodate the myriad circumstances in which claims for lost profits
arise. (50) What constitutes reasonably certain
evidence of lost profits is a fact-intensive determination.
(51) The focus is on the experience of the persons involved in the
enterprise, the nature of the business activity, and the relevant market.
(52) At a minimum, opinions or estimates of lost profits must be based
on objective facts, figures, or data from which the amount of lost profits can
be ascertained. (53) Mere speculation by the
plaintiff does not constitute objective information needed to establish lost
profits. (54)
Reasonable certainty is not demonstrated
when the profits claimed to be lost are largely speculative, as from an activity
dependent on uncertain or changing market conditions, or on chancy business
opportunities, or on promotion of untested products or entry into unknown or
unviable markets, or on the success of new and unproven enterprises.
(55) Factors like these and others that make a business venture risky
in prospect preclude recovery of lost profits in retrospect.
(56) When there are firmer reasons to expect a business to yield a
profit, however, recovery for profits allegedly lost will not be denied simply
because the business is new. (57)
c. Discussion
Much of FTI's brief and response to
Appellees' motion to exclude is a seeming attempt to shift its burden of proving
the admissibility of Dr. Burkman's testimony. (58)
Accordingly, FTI incorrectly argues that the preponderance of the evidence
standard, along with case law and the trial court's scheduling order,
demonstrates that Appellees had a burden to present evidence showing
that FTI's experts are unreliable. Our focus, rather, is on whether FTI
satisfied the standards promulgated in rule 702, Robinson, and its
progeny. (59)
In its brief, FTI contends that it is
important to understand that much of the information used by Claywell and Dr.
Burkman regarding the mortgage industry, mortgage fraud, market share, and costs
came from McGee; therefore, they argue this case turns on the testimony of
McGee. For example, Dr. Burkman's expert report incorporates by reference the
opinions of Claywell, which were based, in large part, on information provided
by McGee. FTI counters Appellees' challenge to the admissibility of Dr. Burkman
by arguing that FTI has shown that McGee is reliable, which establishes
Claywell's reliability. FTI further reasons that since McGee and Claywell are
reliable, so too is Dr. Burkman. For the following reasons, we disagree.
Appellees present five independent grounds
by which we can uphold the trial court's exclusion of FTI's expert testimony.
Assuming arguendo that FTI's experts are qualified, we will address
Appellees' contention that the trial court did not abuse its discretion in
excluding FTI's expert testimony because it was not based upon a reliable
foundation, but rather on the ipse dixit testimony of McGee.
(60)
As FTI acknowledges, one of Appellees'
chief complaints regarding FTI's expert testimony is that since FTI's market
projections are faulty, any opinions based on those assumptions are consequently
unreliable. Appellees attack Claywell's report, which concludes that the
estimated market share would have been 5% in 1999, 7.5% in 2000, 10% in 2001,
and 15% in both 2002 and 2003. Claywell's report explains these assumptions:

        
 The estimated market share of [FTI] is based on conversations with Mr. Chris
 Perrucci and Mr. Dean McGee. Mr. Chris Perrucci, Director of Business
 Development, estimated that the introduction of the [FTI] program into the
 industry could capture approximately 10% to 25% of the market. Mr. Dean McGee
 was not as optimistic as Mr. Perrucci and felt that the market share would
 grow at a slower rate. I have used a lower market capture rate to be more
 reasonable as to the introduction of a new product into the market place.

Appellees argue that this statement does
nothing to justify the assumption that FTI would have ultimately attained a 15%
market share, nor does it explain how McGee defended his projected market share
of 5% in year one, which he felt would grow to 15% in year four.
During the Daubert/Robinson
hearing, the following exchange occurred between Appellees' counsel and Dr.
Burkman concerning the market share projections:

         Q. To your knowledge, has anyone
 other than Mr. McGee done a survey of this market?
         A. No.
         Q. To your knowledge, are there
 other entities out there for hire that could have done the survey of this
 market?
         A. Yes, there are.
         Q. Did Fraud-Tech --
         A. My firm could have done that.
         Q. Were you asked to do that?
         A. I was not asked to do that.
         Q. You were given those
 assumptions by Mr. McGee, correct?
         A. Yes.
         Q. Did Fraud-Tech ever develop a
 marketing budget for the concept developed by Mr. McGee?
         A. I don't know that.
         Q. Did Fraud-Tech ever have a
 business plan created for the concept developed by Mr. McGee?
         A. I believe it did not.
         Q. In addition to the assumption
 of a 5 percent estimated market share in the first year, Mr. Claywell further
 projects there will be an increased market share gained by Fraud-Tech's
 concept in future years; isn't that true?
         A. He does.
         Q. And as you sit here today,
 you have no information whether there will be competing products that might
 come on line between the year 2000 and 2003 that might actually reduce rather
 than increase Fraud-Tech's market share; isn't that true?
         A. Yes. There could very well be
 a new entry into the market that would destroy Fraud-Tech.
 

The trial court later questioned Dr. Burkman about the market share
projections, and Dr. Burkman testified:

         I don't have any ability,
 I think . . . to really know what would be the range of share. I think it
 could be low. It could be one or two percent, it could be 60. . . . [I]f
 Fannie Mae becomes a client of Fraud-Tech's, then this report is ridiculously
 low in value.

Shortly thereafter, FTI's counsel asked Dr. Burkman why the estimated
5% market share was reasonable, to which Dr. Burkman replied:

         I have to assume that Mr.
 McGee's product is capable of doing what it [sic] said it did. Does 5 percent
 seem absurd? In fact, it seems very reasonable.
         [FTI's Counsel]: Does it,
 in your opinion, seem low?
         [Dr. Burkman]: Well, I
 guess I'd rather err on the side of being conservative. I mean, if I said 25
 percent, I might be right. But, you know, we really don't know, and I suspect
 with . . . start-up companies, you just don't really know.
 

FTI concedes that the damages model used by Dr. Burkman and McGee is
very conservative and likely underestimates both total losses and losses due to
fraud. FTI argues that getting a contract with either Fannie Mae or Freddie Mac
would have immediately given FTI more than 15% of the market, and DBT sales
representative Stephen Vereb's testimony that the two organizations were
cooperating on fraud issues showed a good possibility that
both of them would have used FTI's system. Further, FTI contends that the
experience of McGee is a firm reason why FTI could have expected to turn a
profit, and that he had a sound plan for developing the fraud detection system
with Appellees and marketing that system to Fannie Mae and Freddie Mac, which
control 70% of the lending market, according to McGee.
Marta McCall, Appellees' expert on damages, stated that "[n]one of
Fraud-Tech's competitors have achieved a market share of anywhere near 5 percent
even though these competitors had resources vastly superior to those of
Fraud-Tech and have been in business for several years and are known in the
industry." In McGee's affidavit, provided in support of FTI's response to
Appellee's motion to exclude FTI's damages experts, McGee spent considerable
effort refuting the figures and statements in McCall's affidavit. McGee,
however, never discussed his conversations with Claywell, nor did he attempt to
explain his market share projections or objectively justify how he reached his
conclusions. Rather, McGee claimed that his intention was to market the FTI
system to Freddie Mac and Fannie Mae, with whom McGee said he had held
discussions "to do the beta testing of the system."
Appellees' motion to exclude states that "the only foundation for
Claywell's opinion is his unidentified discussions with McGee. Likewise, the
only foundation for [Dr.] Burkman's opinion is the Claywell Report. In short,
this testimony constitutes nothing more than ipse dixit
testimony held to be inadmissible."
We again stress that once Appellees challenged the expert testimony of
McGee, FTI, as the proponent of McGee's testimony, bore
the burden of proving its admissibility under rule 702.
(61) FTI did not meet this burden. The record does not objectively and
verifiably demonstrate the likelihood of any company utilizing FTI's system.
Likewise, the record is devoid of any objective facts, figures, or data upon
which McGee based his opinions regarding the market share and growth rate of
FTI's fraud detection system. (62)
We need not address the other grounds Appellees raise concerning the
exclusion of FTI's damages experts because we conclude that FTI did not
establish the reliability of McGee's ipse dixit opinions
concerning market share projections, assumptions fundamental to both Claywell's
and Dr. Burkman's expert opinions. (63)
Accordingly, we hold that the trial court did not abuse its discretion in
granting Appellees' motion to exclude the testimony of FTI's damages experts.
We further conclude that because the trial court properly excluded the
testimony of McGee, Claywell, and Dr. Burkman, FTI failed to meet its summary
judgment burden to prove damages for its breach of contract, fraud, and
conversion claims. (64) We overrule FTI's third
and fourth issues.
5. Summary Judgment: More Relief Granted than
Requested
FTI argues in its fifth issue that summary judgment was improper
because it raised genuine issues of material fact as to its claims for breach of
contract, fraud, and conversion. In its second issue, FTI argues that the trial
court erred in granting Appellees' motion for summary judgment because the
summary judgment granted more relief than Appellees requested, in that
Appellees' motion for summary judgment did not address FTI's claim for breach of
a contract implied in law concerning the licensing agreement or FTI's request
for specific performance on the licensing agreement.
With respect to FTI's fraud and conversion claims, FTI only requested
relief in the form of damages. As to FTI's contract claims, it sought both legal
and equitable relief, in the form of damages and specific performance. Because
we have held that FTI did not meet its summary judgment burden regarding
damages, summary judgment was proper as to FTI's claims for breach of the
nondisclosure agreement, breach of the letter of intent, fraud, and conversion.
(65) Likewise, we hold that summary judgment was proper on FTI's claim
for breach of the licensing agreement with respect to FTI's requested damages.
(66)
Because FTI also requested specific performance on the licensing
agreement, we address whether genuine issues of material fact exist regarding
the formation of an actual agreement between the parties. FTI conceded during
oral argument that Appellees did not sign the licensing agreement, but FTI
argues that genuine issues of material fact exist concerning whether there was
an offer and an acceptance. (67)
FTI argues that Appellees' conduct involving the licensing agreement
demonstrated that the parties had formed a contract implied in fact.
(68) We have previously stated:
[E]ven if an offer and acceptance are not recorded on paper, dealings
between parties may result in an implied contract where the facts show that the
minds of the parties met on the terms of the contract without any legally
expressed agreement. Accordingly, the parties' conduct may convey an objective
assent to the terms of an agreement, and whether their conduct evidences their
agreement is a question to be resolved by the finder of fact. If the finder of
fact determines that one party reasonably drew the inference of a promise from
the other party's conduct, then that promise will be given effect in law.
(69)
FTI points out that during DBT employee Perrucci's deposition, Perrucci
stated that, on August 20, 1998, he shipped an unsigned draft of the licensing
agreement to FTI for its signature. Perrucci also stated that Robert Andrews (of
FTI) wanted the contract signed and that George Bruder (of DBT) told Perrucci:
"Send [Andrews] the draft. If he will sign it, we'll sign it, and that's
what I told [Andrews]." FTI signed the licensing agreement, but Appellees
never did.
In his deposition, McGee testified that at the end of August 1998,
after FTI had signed the licensing agreement, he met with Beth Kruse-Levy (of
DBT) on one occasion for four or five hours discussing the ideas and concept of
the fraud detection system, so that Kruse-Levy could begin to implement the
project as project manager.
McGee also testified that in September he met with Bruder, Perrucci,
and Andrews in an attempt to get Appellees to sign the licensing agreement and
to find out why they had not yet signed it. McGee testified that revisions were
made to the contract, stating: "There were some very specific words written
into the contract." McGee also stated that he later spoke with Kruse-Levy,
who purportedly told him that "she was under the impression that [they]
should continue to go on with the project because it was a done deal, and she
didn't really feel like . . . having a signed contract was a relevant issue as
far as continuing with the transaction." According to McGee, Kruse-Levy
wanted to continue on because of the time constraints of the contract. Likewise,
during Andrews's deposition, Andrews testified that Perrucci said: "I don't
know why he hasn't signed [the licensing agreement]. He has agreed to sign it.
But just -- let's just keep going. We'll get it done." McGee testified that
he continued developing a data dictionary for the project up until October 8,
1998, when the meeting occurred at FT Mortgage that prompted this lawsuit.
FTI contends that both sides were acting within the time frames of the
licensing agreement and pursuant to its terms, and that such conduct raised
genuine issues of material fact that the licensing agreement constituted a
contract implied in fact. We agree that the trial court erroneously granted
summary judgment on FTI's claim for specific performance on the licensing
agreement because genuine issues of material fact exist as to whether the
agreement constituted a contract implied in fact. (70)
In addition, FTI's sixth amended petition added a claim that Appellees'
actions concerning the licensing agreement afforded FTI recovery under a
contract implied in law theory. (71) Under both
Texas and Florida law, a contract implied in law, or a quasi contract, is
distinguishable from a true contract because a quasi contract is a legal
fiction, an obligation imposed by law regardless of any actual agreement between
the parties. (72) While it is generally true
that a party cannot recover under a quasi contract theory when there is an
express contract covering the subject matter of the parties' dispute, a litigant
may plead and seek to recover under both theories and then recover in accordance
with the evidence presented. (73)
During oral argument, Appellees conceded that they did not amend or
supplement their motion for summary judgment to address FTI's claim based on a
contract implied in law. Under rule 166a(i), a no-evidence motion for summary
judgment must specifically "state the elements as to which there is no
evidence," and there may be no "conclusory motions or general
no-evidence challenges to an opponent's case." (74)
While a plaintiff may not avoid a no-evidence summary judgment simply by filing
an amended claim, if the amended pleading raises a new theory of
liability-rather than merely reiterating the same essential elements of that
party's original claims in another fashion-then summary judgment cannot be
granted as to those new theories of liability. (75)
In this case, FTI's sixth amended petition added a claim raising a new
theory of liability based on a contract implied in law, and Appellees never
moved for summary judgment on that theory. Accordingly, we hold that summary
judgment should not have been granted as to FTI's newly added quasi contractual
theory. (76) We sustain FTI's fifth issue, and
we overrule in part and sustain in part its second issue.
III. Conclusion
Having sustained McGee and Andrew's first issue, we reverse the summary
judgment insofar as it disposed of McGee and Andrews's counterclaims against
Appellees and remand those claims for proceedings consistent with this opinion.
Further, based on our rulings concerning FTI's appeal, we reverse the summary
judgment and remand only with respect to whether FTI may seek specific
performance on the licensing agreement or recovery under its theory of a
contract implied in law. We affirm the summary judgment in all other respects.
 
                                                                        LEE
ANN DAUPHINOT
                                                                        JUSTICE
PANEL B: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.
DELIVERED: March 27, 2003

1. Tex. R. Civ. P. 166a(c); KPMG Peat Marwick v.
Harrison County Hous. Fin. Corp., 988 S.W.2d 746, 748 (Tex. 1999); City
of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979).
2. Rhone-Poulenc, Inc. v. Steel, 997 S.W.2d 217,
223 (Tex. 1999); Friendswood Dev. Co. v. McDade + Co., 926 S.W.2d 280,
282 (Tex. 1996); Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply
Co., 391 S.W.2d 41, 47 (Tex. 1965).
3. Great Am., 391 S.W.2d at 47.
4. Rhone-Poulenc, 997 S.W.2d at 223; Harwell
v. State Farm Mut. Auto. Ins. Co., 896 S.W.2d 170, 173 (Tex. 1995).
5. Great Am., 391 S.W.2d at 47.
6. Clear Creek Basin, 589 S.W.2d at 678.
7. Elliott-Williams Co. v. Diaz, 9 S.W.3d 801,
803 (Tex. 1999).
8. Centeq Realty, Inc. v. Siegler, 899 S.W.2d
195, 197 (Tex. 1995).
9. Carr v. Brasher, 776 S.W.2d 567, 569
(Tex.1989).
10. Tex. R. Civ. P. 166a(i).
11. Id.; In re Mohawk Rubber Co., 982
S.W.2d 494, 497-98 (Tex. App.--Texarkana 1998, orig. proceeding).
12. See Tex. R. Civ. P. 166a(i) cmt.; Moore
v. K Mart Corp., 981 S.W.2d 266, 269 (Tex. App.--San Antonio 1998, pet.
denied); Jackson v. Fiesta Mart, Inc., 979 S.W.2d 68, 71 (Tex.
App.--Austin 1998, no pet.).
13. Frazier v. Yu, 987 S.W.2d 607, 610 (Tex.
App.--Fort Worth 1999, pet. denied); Moore, 981 S.W.2d at 269.
14. Szczepanik v. First S. Trust Co., 883 S.W.2d
648, 649 (Tex. 1994).
15. Moore, 981 S.W.2d at 269.
16. See Castleberry v. Branscum, 721 S.W.2d 270,
271 (Tex.1986); Pabich v. Kellar, 71 S.W.3d 500, 507 (Tex. App.--Fort
Worth 2002, pet. denied) ("A corporation is a separate legal entity that
normally insulates its owners or shareholders from personal liability.").
17. See Tex. R. Civ. P. 38.
18. Mecure Co., N.V. v. Rowland, 715 S.W.2d 677,
679 (Tex. App.--Houston [1st Dist.] 1986, writ ref'd n.r.e.).
19. Id. at 678.
20. Id.
21. Id.
22. Id.
23. Id. at 679.
24. See Randolph v. Walker, 29 S.W.3d 271,
274-75 (Tex. App.--Houston [14th Dist.] 2000, pet. denied) (holding
appellants' claims against two defendants were dismissed when appellants filed
an amended petition that did not include the two defendants); Hanmore Dev.
Corp. v. JBK Enters., 776 S.W.2d 738, 740 (Tex. App.--Corpus Christi 1989,
writ denied) (holding that plaintiff's claims against defendant HDC were
dismissed when the plaintiff's first through fourth amended pleadings failed to
name HDC as a party and limitations barred recovery when the plaintiff renamed
HDC in its fifth amended pleading); Radelow-Gittens Real Prop. Mgmt. v.
Pamex Foods, 735 S.W.2d 558, 560 (Tex. App.--Dallas 1987, writ ref'd n.r.e.)
(holding that "Radelow-Gittens effectively dismissed Pamex from the lawsuit
at the point when it amended its pleadings and omitted all claims of liability
against Pamex"); Burton v. Bridges, 641 S.W.2d 635, 637 (Tex.
App.--El Paso 1982, writ ref'd n.r.e.) ("Since Burton was not named in the
amended petition, he was not a party to the suit at the time the judgment was
entered.").
25. See Lehmann v. Har-Con Corp., 39
S.W.3d 191, 200 (Tex. 2001) ("A judgment that grants more relief than a
party is entitled to is subject to reversal.").
26. See Tex. R. App. P. 47.1.
27. Tex. R. Civ. P. 166a(c).
28. See id.
29. See Goswami v. Metro. Sav. & Loan Ass'n,
751 S.W.2d 487, 491 (Tex. 1988); Gilchrist v. Bandera Elec. Coop., 966
S.W.2d 716, 718 (Tex. App.--San Antonio 1998, no pet.).
30. Goswami, 751 S.W.2d at 491; Gilchrist,
966 S.W.2d at 718.
31. See EZ Pawn Corp. v. Mancias, 934 S.W.2d 87,
91 (Tex. 1996) (discussing use of Rule 11 agreement to extend deadline for
filing a response to a motion to compel arbitration); see also Rabe v. Guar.
Nat'l Ins. Co., 787 S.W.2d 575, 580 (Tex. App.--Houston [1st
Dist.] 1990, writ denied) (stating, with respect to the insured's late filing of
his response to the insurer's motion for summary judgment, "There is no
written agreement for an extension in the record as required by Tex. R. Civ. P.
11."); Timothy Patton, Summary Judgments in Texas, § 2.02 (3d ed. 2002).
32. See Duncan v. Cessna Aircraft Co., 665
S.W.2d 414, 419 (Tex. 1984) (determining that, before undertaking choice of law
analysis, the court "must first determine whether there is a difference
between the rules of Texas and New Mexico on this issue"); Young
Refining Corp. v. Pennzoil Co., 46 S.W.3d 380, 385 (Tex. App.--Houston [1st
Dist.] 2001, pet. denied) (finding no necessity to decide which state's law
applied absent a conflict of law on the issues presented); St. Paul Surplus
Lines Ins. Co. v. Geo Pipe Co., 25 S.W.3d 900, 903 n.2 (Tex. App.--Houston
[1st Dist.] 2000, no pet.) (op. on reh'g) ("In the absence of a
true conflict of law, we do not undertake choice of law analysis.").
33. See Young Refining Corp., 46 S.W.3d
at 385; St. Paul Surplus Lines Ins. Co., 25 S.W.3d at 903 n.2.
34. See Tex. Instruments, Inc. v. Teletron
Energy Mgmt., Inc., 877 S.W.2d 276, 279 (Tex. 1994).
35. Id.
36. See Gevinson v. Manhattan Constr. Co., 449
S.W.2d 458, 465 n.2 (Tex. 1969); Pittsburgh Corning Corp. v. Walters, 1
S.W.3d 759, 769 (Tex. App.--Corpus Christi 1999, pet. denied); Stine v. Koga,
790 S.W.2d 412, 414 (Tex. App.--Beaumont 1990, writ dism'd by agr.); Jack H.
Brown & Co. v. N.W. Sign Co., 718 S.W.2d 397, 398 (Tex. App.--Dallas
1986, writ ref'd n.r.e.).
37. See Young Refining Corp., 46 S.W.3d
at 385; St. Paul Surplus Lines Ins. Co., 25 S.W.3d at 903 n.2.
38. Tex. R. App. P. 33.1(a); see also Tex. R.
Evid. 103(a)(1).
39. Bushell v. Dean, 803 S.W.2d 711, 712 (Tex.
1991) (op. on reh'g).
40. Frazier, 987 S.W.2d at 610.
41. See Tex. R. Civ. P. 166a(c); Martin v.
Martin, Martin & Richards, Inc., 989 S.W.2d 357, 359 (Tex. 1998); see
also Patton, supra note 31, § 7.01.
42. See Tex. R. App. P. 33.1(a).
43. See City of San Antonio v. Guidry, 801
S.W.2d 142, 150 (Tex. App.--San Antonio 1990, no writ) (stating that recovery of
both lost profits and loss of business value for the same time period would be
duplicative); Trailer Ranch, Inc. v. Levine, 523 So.2d 629, 631 (Fla.
Dist. Ct. App. 1988) ("[R]ecovery for loss of a business venture is to be
measured either by lost profits or loss of business value, but not both.").
44. Tex. R. Evid. 702; Guadalupe-Blanco River Auth.
v. Kraft, 77 S.W.3d 805, 807 (Tex. 2002); Gammill v. Jack Williams
Chevrolet, Inc., 972 S.W.2d 713, 720 (Tex. 1998); E.I. du Pont de
Nemours & Co. v. Robinson, 923 S.W.2d 549, 556 (Tex. 1995).
45. See K-Mart Corp. v. Honeycutt, 24 S.W.3d
357, 360 (Tex. 2000); Gammill, 972 S.W.2d at 718-19.
46. Johnson v. Fourth Court of Appeals, 700
S.W.2d 916, 918 (Tex. 1985).
47. Honeycutt, 24 S.W.3d at 360.
48. See id.; Bradley v. State ex rel. White,
990 S.W.2d 245, 247 (Tex. 1999).
49. Tex. Instruments, 877 S.W.2d at 279;
Vingcard A.S. v. Merrimac Hospitality Sys., Inc., 59 S.W.3d 847, 863 (Tex.
App.--Fort Worth 2001, pet. denied) (op. on reh'g).
50. Tex. Instruments, 877 S.W.2d at 279.
51. Szczepanik, 883 S.W.2d at 649; SBC
Operations, Inc. v. Bus. Equation, Inc., 75 S.W.3d 462, 467 (Tex. App.--San
Antonio 2001, pet. denied).
52. Tex. Instruments, 877 S.W.2d at 280; Ishin
Speed Sport, Inc. v. Rutherford, 933 S.W.2d 343, 351 (Tex. App.--Fort Worth
1996, no writ).
53. Szczepanik, 883 S.W.2d at 649.
54. See Holt Atherton Indus. v. Heine, 835
S.W.2d 80, 84 (Tex. 1992).
55. Tex. Instruments, 877 S.W.2d at 279; Vingcard
A.S., 59 S.W.3d at 863.
56. Tex. Instruments, 877 S.W.2d at 279; SBC
Operations, Inc., 75 S.W.3d at 467.
57. Tex. Instruments, 877 S.W.2d at 280
("The fact that a business is new is but one consideration in applying the
'reasonable certainty' test.").
58. See Robinson, 923 S.W.2d at 557 ("Once
the party opposing the evidence objects, the proponent bears the burden of
demonstrating its admissibility.").
59. See Tex. R. Evid. 702; Robinson,
923 S.W.2d at 556.
60. See Black's Law Dictionary 833 (7th
ed. 1999) (stating that the term "ipse dixit" means "[s]omething
asserted but not proved" and is literally translated "he himself said
it"); see also Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.
Ct. 512, 519 (1997); Earle v. Ratliff, 998 S.W.2d 882, 890 (Tex. 1999)
("An expert's simple ipse dixit is insufficient to establish a
matter; rather, the expert must explain the basis of his statements to link his
conclusions to the facts.").
61. See Tex. R. Evid. 702; Robinson,
923 S.W.2d at 557.
62. See Szczepanik, 883 S.W.2d at
649.
63. See Tex.
Instruments, 877 S.W.2d at 281; Holland v. Hayden,
901 S.W.2d 763, 766 (Tex. App.--Houston [14th Dist.]
1995, writ denied) (holding that the evidence was insufficient to support an
award for lost profits because the jury "had only the subjective and
conclusory opinion of an interested party, which, without any objective basis,
could have just as easily been set much higher or lower").
64. See Tex.
Instruments, 877 S.W.2d at 281 (holding evidence of lost profits legally
insufficient to support jury's finding).
65. See Tex. R. Civ. P. 166a(i); Weiss
v. Mech. Associated Servs., Inc., 989 S.W.2d 120, 124 (Tex. App.--San
Antonio 1999, pet. denied). We note that on appeal FTI only complains that
Appellees' motion for summary judgment failed to address FTI's request for
specific performance on the licensing agreement. FTI, therefore, has waived any
complaint regarding whether the summary judgment is proper as to its request for
specific performance on the nondisclosure agreement and the letter of intent. See
Tex. R. App. P. 38.1.
66. See Tex. R. Civ. P. 166a(i); Weiss,
989 S.W.2d at 124.
67. See Harco Energy, Inc. v. Re-Entry
People, Inc., 23 S.W.3d 389, 392 (Tex. App.--Amarillo 2000, no pet.)
("For a contract to exist, there must be an offer, an acceptance, and valid
consideration."); Mettler, Inc. v. Ellen Tracy, Inc.,
648 So.2d 253, 255 (Fla. Dist. Ct. App. 1994) (stating elements of a valid
contract are offer, acceptance, and consideration).
68. See Haws & Garrett Gen.
Contractors, Inc. v. Gorbett Bros. Welding Co., 480 S.W.2d 607, 609 (Tex.
1972) (stating that a contract implied in fact arises from the acts and conduct
of the parties, it being implied from the facts and circumstances); Commerce
P'ship 8098 L.P. v. Equity Contracting Co., 695 So.2d 383, 385 (Fla. Dist.
Ct. App. 1997) ("A contract implied in fact is one form of an enforceable
contract; it is based on a tacit promise, one that is inferred in whole or in
part from the parties' conduct, not solely from their words."); see
also Restatement (Second) of Contracts § 4 (1981) ("A promise may be
stated in words either oral or written, or may be inferred wholly or partly from
conduct.").
69. Ishin Speed Sport, 933 S.W.2d
at 348 (citations omitted); see also Commerce P'ship, 695
So.2d at 385-86 ("[A] [c]ourt should determine and give to the alleged
implied contract 'the effect which the parties, as fair and reasonable men,
presumably would have agreed upon if, having in mind the possibility of the
situation which has arisen, they had contracted expressly thereto.'"); Mecier
v. Broadfoot, 584 So.2d 159, 160 (Fla. Dist. Ct. App. 1991) (stating that
the issue of whether a contract implied in fact existed should be submitted to a
jury).
70. See Ishin Speed Sport, 933
S.W.2d at 348; Mecier, 584 So.2d at 160.
71. See Mowbray v. Avery, 76 S.W.3d
663, 679 (Tex. App.--Corpus Christi 2002, pet. denied); Nagel
v. Ky. Cent. Ins. Co., 894 S.W.2d 19, 21 (Tex. App.--Austin 1994, writ
denied); Commerce P'ship, 695 So.2d at 386.
72. See Fortune Prod. Co. v. Conoco,
Inc., 52 S.W.3d 671, 684 (Tex. 2000); Commerce P'ship,
695 So.2d at 386.
73. See Tex. R. Civ. P. 48; Fortune
Prod. Co., 52 S.W.3d at 684; Kovtan v. Frederiksen,
449 So.2d 1, 1 (Fla. Dist. Ct. App. 1984) (per curiam); see
also 14 Tex. Jur. 3d. Contracts § 11 (1997).
74. Tex. R. Civ. P. 166a(i) and cmt.; Specialty
Retailers, Inc. v. Fuqua, 29 S.W.3d 140, 147 (Tex. App.--Houston [14th
Dist.] 2000, pet. denied).
75. Specialty Retailers, 29 S.W.3d
at 147; see also Lampasas v. Spring Ctr., Inc., 988 S.W.2d
428, 436-37 (Tex. App.--Houston [14th Dist.] 1999, no
pet.) (holding summary judgment was proper even as to claims in an amended
petition because "the amended petition merely reiterates the same essential
elements in another fashion, and the motion for summary judgment adequately
covers these new variations"); Patton, supra note 31,
§ 5.03[2][b].
76. See Lampasas, 988 S.W.2d at
436-37.