**SBC OPERATIONS, INC. f/k/a Southwestern Bell Communications, Inc. and Southwestern Bell Telephone Company, Appellants,**

v.

**THE BUSINESS EQUATION, INC., A California Corporation, Appellee.**

No. 04–00–00698–CV.

Court of Appeals of Texas, San Antonio.

Dec. 19, 2001.

Rehearings Overruled Jan. 31 and March 11, 2002.

**464**

Daniel W. Lanfear, Hubert W. Green, The Kleberg Law Firm, P.C., Jacqueline M. Stroh, Sharon E. Callaway, Crofts & Callaway, P.C., San Antonio, for appellants.

Renee Forinash McElhaney, Rosemarie Kanusky, W. Wendell Hall, Fulbright & Jaworski, L.L.P., Paul Bartlett, Jr., Law Office of Paul N. Bartlett, Jr., Richard J. Karam, Law Offices of Richard J. Karam, San Antonio, for appellee.

Sitting: PHIL HARDBERGER, Chief Justice, TOM RICKHOFF, Justice, SARAH B. DUNCAN, Justice.

TOM RICKHOFF, Justice.

SBC Operations, Inc. ("SBC") and Southwestern Bell Telephone Company ("SBTC") appeal a judgment rendered on a jury verdict. The jury found SBC liable to The Business Equation, Inc. ("BEI") for fraud and breach of contract. SBC and SBTC present twelve issues challenging the jury's liability and damage findings. We conclude the evidence is legally insufficient to support the award of lost profits and terminal value, and the oral contract between the parties is barred by the statute of frauds. Therefore, we reverse the judgment and render a take-nothing judgment in favor of SBC and SBTC.

## BACKGROUND

In January 1997, John Allshouse presented the idea of a member services program to SBC. Allshouse and his partner Clark "Dub" Doyal ultimately formed A & D Alliance Resources, Inc. ("ADAR"). The member services program was designed to offer discounts on various goods and services from participating vendors to SBC small and medium size business customers. The program was later given the name BizLink.

As ADAR worked to locate vendors to join the program, ADAR discovered that BEI was engaged in a similar program on a much smaller scale. Judy Wallace and Joyce Axtell were the primary officers of BEI. BEI had contracts in place with vendors that ADAR thought would be good vendors to include in BizLink. On April 10, 1997, ADAR and BEI entered into a

letter agreement "to authorize [ADAR] to use agreed upon contracts with vendors/partners to provide these services for a member services program for [a] client of [ADAR]." On April 15, 1997, BEI entered into a non-disclosure agreement with SBC. At that time, BEI first learned that the program was to be offered to SBC's customers. The non-disclosure did not commit either party to a specific arrangement but was intended to facilitate the free-flow of information during the planning and negotiating phases.

As the parties were working on business plans for BizLink, SBC was undertaking to acquire Pacific Bell ("PacBell"). In July 1997, SBC discussed BizLink with PacBell's marketing team to determine if BizLink should be offered to PacBell business customers. On July 10, 1997, the parties met with several of the participating vendors to discuss BizLink.

The planning documents envisioned that a direct mailing advertising BizLink would be sent to all the small and medium size business customers of SBC and PacBell. The customers would not be charged to join BizLink. The vendors would pay royalties based on the amount of sales to SBC and PacBell customers. The royalties would be divided as follows: SBC—60%; ADAR—20%; and BEI—20%. The goal of the BizLink program was customer retention; however, the financial projections showed that BizLink would break-even in 1999 based on an early 1997 beginning date.

A formal Member Services Agreement ("MSA") was entered into between SBC and ADAR on August 28, 1997. Although BEI had wanted to be a party to the MSA, it was not made a party to the final agreement. An appendix of the M.S.A. describes the services ADAR agreed to provide. ADAR is defined as the Seller in the MSA. The appendix states that BEI was approved as a subcontractor. On September 15, 1997, ADAR and BEI entered into a separate contract, setting forth their agreement with respect to the services each was to provide with respect to the BizLink program. The M.S.A. was incorporated by reference into the agreement between ADAR and BEI.

In November 1997, a meeting was held to alleviate the vendors' concerns regarding the delay in beginning the program. A revised business plan was discussed with a test launch followed by a full launch of BizLink to all SBC/PacBell customers. The plans included a goal of a 10% enrollment rate; i.e., if the direct mailing was sent to 100,000, the goal was that 1,000 customers would enroll. In 1998, the goals of BizLink were changed, and SBC management wanted the program to break-even in 1998.

The launch of BizLink involved a three-city mailing in February 1998: 40,000 mailings in Houston, Texas; 14,934 mailings in Wichita, Kansas; and 25,481 mailings in Austin, Texas. As the responses were being measured, it appeared that the 10% goal would not be met. As a result, additional marketing efforts were undertaken, including a reminder post-card to the same 80,415 customers, another 8,900 mailings to new business customers in a five-state area, inbound telemarketing by SBC (offering BizLink to customers calling for different reasons), outbound telemarketing by SBC (calling and offering BizLink to customers), an advertisement in a magazine SBC provided to customers, and bill inserts. On March 20, 1998, the company SBC paid to perform the direct mailing, RMG, stopped measuring the response level. Based on the responses they measured, only 2.12% of the customers receiving the direct mail enrolled in BizLink.

SBC sent ADAR a formal letter terminating the M.S.A. on May 6, 1998. BEI

sued SBC for breach of contract and fraud. A jury found SBC liable and awarded BEI $3.6 million for breach of the MSA, $94,000 for breach of an oral call center agreement, $4.6 million for fraud, $4.75 million in exemplary damages,[1] and $1.02 million in attorneys' fees, with additional attorneys' fees contingent on appeal. BEI elected to recover the damages for the fraud claim. SBC and SBTC timely filed this appeal.

## LIABILITY FOR BREACH OF THE ORAL CALL CENTER CONTRACT

■ In April of 1998, SBC and BEI were modifying the BizLink business plans to find ways to cut expenses and to break-even quicker. At a meeting, BEI orally agreed to take over the inbound call center for $10,000, plus an additional $10,500 per month. BEI operated the call center from April 1998 through August 1999.

The jury found that SBC breached its oral agreement with BEI, and awarded $94,000 in damages. On appeal, SBC and SBTC argue that the statute of frauds bars such a recovery, and we agree.

■ The statute of frauds provides that certain promises and agreements are not enforceable unless they are in writing. TEX. BUS. & COM.CODE ANN. § 26.01(a) (Vernon 1987). An agreement that is not to be performed within one year from the date of its making must be in writing to be enforceable. *Id.* If a contract explicitly calls for performance over a period longer than one year, the mere theoretical possibility of termination of the contract within one year because of death or another fortuitous event does not take the contract out of the statute of frauds. *Young v.*

*Ward,* 917 S.W.2d 506, 511 (Tex.App.-Waco 1996, no writ).

In this case, BEI agreed to take over the call center functions for the full launch of BizLink. In the November 1997 business strategy presentation, the full launch would begin in April of 1998 and continue through the end of 1999, a period in excess of one year. The possibility that SBC could terminate BizLink within one year does not take the contract out of the statute of frauds. *Id.*

## SUFFICIENCY OF THE EVIDENCE—LOST PROFITS AND TERMINAL VALUE

■ SBC and SBTC contend there is legally and factually insufficient evidence to support the jury's award of lost profits and terminal value. We conclude that the no-evidence challenge is dispositive of all remaining issues on appeal. In reviewing the no-evidence challenge, we consider only the evidence in the light most favorable to the finding on lost profits and terminal value, and we disregard all evidence and inferences to the contrary. *See Vickery v. Vickery,* 999 S.W.2d 342, 375–76 (Tex.1999). If there is a scintilla of evidence to support the finding, the finding will be upheld. *See id.*

### A. The Lost Profits "Reasonable Certainty" Test

■ Loss of profits damages need only be proven with reasonable certainty, and the rule regarding such proof is intended to be flexible so as to accommodate the various circumstances in which claims for lost profits arise. *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex. 1994); *America's Favorite Chicken Co. v. Samaras,* 929 S.W.2d 617, 629 (Tex.App.-

---

**1.** The jury awarded BEI $2.85 million in exemplary damages against SBC and $1.9 million in exemplary damages against SBTC.

San Antonio 1996, writ denied). What constitutes reasonably certain evidence of lost profits is a fact intensive determination. *Szczepanik,* 883 S.W.2d at 649; *Samaras,* 929 S.W.2d at 629. At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained. *Szczepanik,* 883 S.W.2d at 649.

 The "reasonable certainty" test has clear parameters. *Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.,* 877 S.W.2d 276, 279 (Tex.1994). Profits that are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and unproven enterprise, cannot be recovered. *Id.* Factors like these and others that make a business venture risky in prospect preclude recovery of lost profits in retrospect. *Id.*

 Where estimates are based on objective facts or data and there are firm reasons to expect a business to yield a profit, recovery is not prohibited simply because the enterprise is new *Samaras,* 929 S.W.2d at 629. It is the activity that is the enterprise, and if the activity is well-established, the fact that a newly formed entity is engaging in the activity will not preclude recovery. *Samaras,* 929 S.W.2d at 629.

BEI called three experts to the stand. James Perdiew testified regarding the anticipated revenues and expenses for the BizLink program during the three-year term of the MSA; Dr. Harvey Sundel was retained to project the revenues and costs associated with the BizLink program over three years; and David Marshall testified regarding the terminal value of the BizLink program.

## B. PERDIEW'S EXPERT OPINION

 Perdiew created an econometric model of BizLink to determine the profits BizLink would have earned had SBC completed the full incremental launch. The model contains variables based upon SBC's representations, including a complete launch to two million SBC and PacBell customers, outbound and inbound telemarketing, and a three-year term. Among Perdiew's variables were the response and purchase rates, based on his experience or vendor information.

Perdiew's model has twenty "drivers" or assumptions that underlie his calculations, including: (1) a 10% response rate; (2) an estimated cost of $800 per thousand direct mail pieces that was only charged to the program in years two and three because SBC bore the cost in year one; (3) a 15% downward adjustment for the loss of SBC as the program sponsor after year one; (4) a 20% upward adjustment in year two and three due to improvements made in the marketing effort through experience; and (5) a separate response and activation rate for each vendor based on Perdiew's experience and SBC's estimates.

Perdiew's model also included cost variables. He attributed no marketing costs to ADAR or BEI for year one, because he understood SBC would bear that cost in the first year. In years two and three, he attributed 100% of the marketing cost to ADAR and BEI, because SBC would not sponsor the program after year one. He did not deduct general and administrative expenses for the three-year projection. He did not apportion 60% of the royalties due SBC in the first year or divide the royalties between ADAR and BEI in any of the three years for which he gave estimates.

Perdiew opined that the net value of the BizLink program for the full three years

would be $14,153,470, based on $3,862,945 in year one; $3,642,031 in year two; and $6,648,494 in year three.

Although Perdiew has vast experience in direct marketing, we conclude that his testimony was not reliable because he did not factor in actual data from the test launch; thus, his testimony provides no evidence of lost profits.

### C. SUNDEL'S EXPERT OPINION

■■ Sundel was retained to project the revenues and costs associated with BizLink over three years. Sundel explained his testimony differed from Perdiew's because Perdiew's assumptions included projections based on Perdiew's experience while his projections were based on the information obtained through the test launch of BizLink. Sundel was critical of the results reported from the test launch because the results were only measured for forty-eight days. He used the number of activators and the average royalty per purchase reported from the test launch. Sundel applied these numbers to a full roll-out of the program to all SBC and PacBell customers, with the timing based on the launch strategy described in the business plan. He explained that he adjusted some of the figures for use in later mailings because of the number of non-deliverables and subsequent mailing lists would not include those non-deliverables. Sundel did not adjust his results for any anticipated growth, although he expected growth. Sundel included telemarketing because telemarketing was undertaken in the test launch and the modified business plan included telemarketing. Based on Sundel's experience in telemarketing, he estimated the enrollment rate that would be achieved by using telemarketing to new connects or new customers. He explained that the cost of the direct mailing was charged to SBC, while the cost of the telemarketing was charged to BEI and ADAR. Sundel included an attrition rate percentage in his calculations. Sundel testified that he based the purchase rate percentage each month on SBC's projected 65%, but he reduced the estimated percentage to a more conservative 50% based on his experience.

Sundel provided two calculations. One calculation included a $3.50 royalty that was based on SBC's forecast after the media test. The second calculation included a $6.61 royalty that was computed by dividing the dollar amount of the actual purchases following the test launch by the dollar amount of the royalties for the same period.

Sundel testified that the information regarding operating expenses was provided by BEI and ADAR and certain items he provided based on his experience. Sundel included general and administrative expenses and an expense to inform customers that SBC would no longer be associated with BizLink after the full launch. He also included a cost for purchasing new business lists.

Based on the $6.61 royalty, Sundel calculated that the present day value of the total net profit over the three year period was $22,971,315. Based on the $3.50 royalty, Sundel calculated that the present day value of the total net profit over the three year period was $9,546,445.

Despite the mathematical precision with which Sundel calculated BEI's lost profits, we conclude there is little, if any, factual basis for the assumptions underlying many of his figures. Sundel's estimates were not based on the realities of how well—or how poorly—the program performed during the media test but rather on assumptions, based on his experience, about the success of the program's potential expansion.

Sundel's projection of future revenue and expenses was based on assumptions that the program would continue to attract new enrollees, who would make increased purchases under the program. Unfortunately, these assumptions had no basis in fact. Certainly the approximately eight thousand enrollees from a mailing of close to 160,000 did not justify these assumptions. Further, only 203 purchases resulted from all the mailings and additional contacts through the service centers. Although the purchase rate was 2.50%, Sundel's assumptions included a 50% purchase rate, based on his experience.

Although the concept of an affinity program such as BizLink is not new and the *possibility* of BizLink's success was ably demonstrated by Sundel, the *fact* of its success, based on the media test, was very much in doubt. Because Sundel's conclusions about BEI's lost profits were based on his assumptions, there is no evidence of objective facts, figures, and data from historical profitability; thus, Sundel's testimony provides no evidence of lost profits.

## D. Terminal Value

■ David Marshall testified regarding the terminal value of the BizLink program. Marshall took Sundel's lost profits projection for the third year of the BizLink program, less taxes, multiplied this number by three, and arrived at his value of BizLink's future income. Because we have determined that Sundel's projections constitute no evidence of lost profits, we conclude that Marshall's testimony is not sufficiently reliable for purposes of admissibility. Thus, there is no evidence of BizLink's terminal value.

## FRAUD AND BREACH OF M.S.A. § CLAIMS

The jury found that SBC breached the M.S.A. § and committed fraud against BEI, and awarded damages. On appeal, SBC and SBTC challenge both the liability findings and the damage award.

The jury was instructed to consider only lost profits and terminal value in their calculation of the amount of damages owed for breach of the M.S.A. § and fraud. Having found no evidence to support BEI's lost profits or BizLinks' terminal value, we need not detail the lack of evidentiary support for the amount of damages awarded by the jury, and we do not address SBC and SBTC's challenge to the liability findings.

## CONCLUSION

We *reverse* the judgment in favor of BEI and render a take-nothing judgment in favor of SBC and SBTC.

Dissenting opinion by PHIL HARDBERGER, Chief Justice.

PHIL HARDBERGER, Chief Justice, dissenting.

This case tests the abuse of discretion standard for the trial court acting as the "gatekeeper" for expert testimony. The trial court took all the appropriate steps that a "gatekeeper" is supposed to take and, in my opinion, decided the admissibility question with ample evidence to make the court's decision a reasonable one. I do not think there was an abuse of discretion, but my learned colleagues disagree, so I must respectfully dissent. I dissent to all of the majority opinion with the sole exception of the majority's conclusion that the oral call center contract was barred by the statute of frauds. I agree it was.

The majority concludes that the evidence is legally insufficient to support the jury's damage award. The basis of the majority's conclusion is the majority's determination that the testimony of James Perdiew and Dr. Harvey Sundel was unre-

liable. Perdiew and Dr. Sundel testified regarding the projected net profit of the BizLink program had it been fully launched as represented by SBC. Because a third expert, David Marshall, used the net profit projections provided by Dr. Sundel in calculating the terminal value of the BizLink program, the majority also rejects Marshall's testimony as unreliable. I respectfully dissent because the trial court did not abuse its discretion in determining that the testimony of Perdiew and Dr. Sundel was sufficiently reliable and, therefore, was admissible.

A. Standard of Review

A two-part test governs whether expert testimony is admissible: (1) the expert must be qualified; and (2) the testimony must be relevant and be based on a reliable foundation. *Helena Chemical Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex.2001). The trial court makes the initial determination about whether the expert and the proffered testimony meet these requirements. *Id.* The trial court has broad discretion to determine admissibility, and we will reverse only if there is an abuse of that discretion. *Id.*

In *E.I. du Pont de Nemours and Co., Inc. v. Robinson*, six nonexclusive factors were identified to determine whether an expert's testimony is reliable. 923 S.W.2d 549, 557 (Tex.1995). However, the Texas Supreme Court has recognized that the *Robinson* factors will not apply to all experts' testimony. *See Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726–27 (Tex.1998). In those instances, there still must be some basis for the opinion offered to show its reliability, and, ultimately, the trial court must determine how to assess reliability. *Helena*, 47 S.W.3d at 499.

B. James Perdiew

James Perdiew was called as an expert to testify regarding the anticipated reve-

nues and expenses for the BizLink program during the three-year term of the MSA. Perdiew testified that he has been involved in direct marketing for thirty years. For six years, Perdiew had worked in market planning and analysis, advertising and sales promotion at a large department store chain. Perdiew then worked eleven years as a national account executive for a company that provided consultative direct marketing services for a variety of direct marketing firms around the United States. In 1982, Perdiew started his own firm that provides consultative direct marketing services to various clients. Perdiew had worked on programs offering a package of benefits or services to small businesses similar to the BizLink program. As part of his services, Perdiew worked to develop projections by building econometric models, which are "mathematical depictions of a business" that "try to take into account all of the key things that affect a business so that from a mathematical and financial point of view, [we] can evaluate the affect [sic] of changes and so we can project what happens over time." Perdiew stated that he uses a 90 percent level of confidence in his calculations. Perdiew testified that his methodology is called "standard procedures" in the direct marketing business.

SBC and SBTC assert numerous specific reasons to support their contention that Perdiew's opinion was unreliable. The following summarizes the assertions and the reason I believe the record does not support the assertions.

(1) Perdiew is a marketing expert and, therefore, is not qualified to testify as a damages expert.

The evidence showed that Perdiew has thirty years of direct marketing experience and routinely develops econometric models in the course of his business. Accordingly, Perdiew was qualified to give his testimony.

(2) Perdiew used response rates that were based on predictions as opposed to actual results.

Perdiew explained that the reason he did not use the response rate reported by RMG was due to the early cut-off of results. Perdiew explained that the results were only counted for forty-eight days; therefore, the actual reported response rate was not a proper measure.

(3) Perdiew used higher response rates for certain vendors based on his experience, and Perdiew's estimation of enrollment rate and growth rate were unreliable.

The higher response rates were based both on Perdiew's experience and SBC's estimates. Just as "[o]bservations of enough bees in various circumstances to show a pattern would be enough to support [a beekeeper's] opinion," *Gammill*, 972 S.W.2d [at] 726, the measuring of response rates to various vendors in numerous direct marketing programs provides a basis for Perdiew to use his experience in providing a response rate taking into consideration SBC's estimates. Furthermore, Perdiew's estimation of enrollment rate and growth rate were based on his vast experience in direct marketing programs.

(4) Perdiew should not have included telemarketing efforts in his calculation.

Perdiew stated that telemarketing was used in reality, telemarketing was included in the business plan, and "part of [Perdiew's] role [was] to project how the BizLink business would have performed if allowed to go forward using the best practices in direct marketing. That would have included telemarketing." This is a sufficient explanation of Perdiew's reason for including telemarketing.

(5) Perdiew failed to allocate the lost profits between SBC, BEI, and ADAR, failed to include general and administrative costs, and failed to consider the financial condition of BEI and ADAR.

Perdiew explained that the allocation of the lost profits was not within the scope of his assignment. Perdiew was assigned to evaluate the BizLink program. Perdiew did not evaluate ADAR, BEI or SBC. If BEI or ADAR had a negative net worth, Perdiew explained that "[i]t would have no bearing on the vitality of the BizLink program's royalties." Finally, Perdiew explained that "G & A is allocated to specific programs," and "[t]he allocations are arbitrary and judgmental within each individual corporation. The direct costs involved with operating a program or a part of a business are necessary to evaluate the feasibility of the business."

Considering Perdiew's testimony as a whole, the trial court did not abuse its discretion in admitting Perdiew's testimony because it was sufficiently reliable. Perdiew's econometric model requires certain assumptions to be made. Perdiew explained those assumptions and the basis for them. In those instances in which the assumptions differed from actual results, Perdiew explained why the data from the test launch was unreliable.

## C. Dr. Harvey H. Sundel

Dr. Harvey Sundel has a bachelor's and master's degree in marketing. He also has a Ph.D in business administration with an emphasis in marketing. Dr. Sundel has taught marketing and been involved in marketing research for over 30 years. Dr. Sundel has his own consulting firm which does market research. Dr. Sundel has performed services for numerous industries including telecommunications. Dr. Sundel's telecommunications clients in-

clude AT & T, U.S. West, Nextel Communications, and Southwestern Bell. Dr. Sundel's firm performs approximately 200 projects a year. Approximately 20% of the projects Sundel performs require projections.

SBC and SBTC assert numerous specific criticisms of Dr. Sundel's testimony. The following summarizes the assertions and the reason I believe the record does not support the assertions.

(1) Dr. Sundel has no qualifications in either cost accounting or in performing a damage calculation.

The evidence showed that Dr. Sundel has marketing degrees and wide experience in conducting marketing research, including making projections regarding a project's revenues and expenses.

(2) Dr. Sundel's calculations included rates that "bore no resemblence to actual experience."

Dr. Sundel explained the basis for each figure included in the calculation. The figures were based on either actual results adjusted for information learned in the test launch that would be applied in the full roll-out or Dr. Sundel's experience applied to SBC's planned projections.

(3) Dr. Sundel included telemarketing after SBC was out of the program.

Dr. Sundel stated that telemarketing was used during the test launch and BEI informed him BEI intended to continue telemarketing efforts.

(4) Dr. Sundel did not include an adjustment for the advent of the internet.

Nothing in the record would support the need for including such an adjustment.

(5) Dr. Sundel accepted the expense amounts provided by BEI.

SBC and SBTC provide no record citations to evidence indicating that those numbers are unreliable.

(6) Dr. Sundel's model did not divide the royalties between SBC, BEI, and ADAR.

Dr. Sundel was reviewing the revenues and costs for the BizLink Program, not determining what each of the participating companies would receive as a result.

Considering Dr. Sundel's testimony as a whole, the trial court did not abuse its discretion in admitting Dr. Sundel's testimony because it was sufficiently reliable. Although Dr. Sundel's calculations required certain assumptions to be made, Dr. Sundel explained those assumptions and the basis for them. In those instances in which the assumptions differed from actual results, Dr. Sundel explained why the data from the test launch was unreliable or adjusted.

D. Conclusion

The majority's primary criticism of Perdiew is that he "did not factor in actual data from the test launch," and the majority's primary criticism of Dr. Sundel is that his conclusions "were based on his assumptions" which had "no basis in fact." However, Perdiew explained his "standard procedures" methodology which is used in the direct marketing business, and he further explained the concept of the econometric model he used. In addition, Dr. Sundel explained that he used the data from the media test that was reliable. Both Perdiew and Dr. Sundel only made assumptions when the media test data was unreliable because SBC cut off the collection of data before the data could reliably measure the response to the BizLink program. In view of the prior focus group study demonstrating that customers needed time in order to be convinced that the BizLink program did not come with a "catch," SBC was aware that the data would not reliably measure the response to the BizLink program if the results were prematurely cut

off. Therefore, Perdiew and Dr. Sundel properly refused to base their calculations on SBC's reported data because opinions drawn from unreliable foundational data are likewise unreliable. *See Helena,* 47 S.W.3d at 499. Both Perdiew and Dr. Sundel demonstrated that their opinions comported with applicable professional standards and had a reliable basis in the knowledge and experience of their marketing discipline. *See id.*

Because the trial court did not abuse its discretion in admitting the testimony of Perdiew and Dr. Sundel, their testimony was more than a scintilla of evidence to support the jury's damage award. I would affirm the jury's verdict with the exception of the damages awarded for the breach of the oral call center contract.