NO.
12-05-00428-CV

 

IN THE COURT OF APPEALS 

 

TWELFTH COURT OF APPEALS DISTRICT

 

TYLER, TEXAS

J. MARK SWINNEA, BRADY         §                      APPEAL FROM THE 114TH

ENVIRONMENTAL, INC. AND

MALMEBA COMPANY, LTD.

APPELLANTS

 

V.        §                      JUDICIAL DISTRICT COURT OF

 

ERI CONSULTING
ENGINEERS, INC.

AND LARRY G. SNODGRASS,

APPELLEES §                      SMITH
COUNTY, TEXAS

                                                                                                                                                           


OPINION

            Mark
Swinnea, Brady Environmental, Inc., and Malmeba Company, Ltd. appeal from an
adverse judgment entered after a bench trial in a suit brought by ERI
Consulting Engineers, Inc. (ERI) and Larry G. Snodgrass for fraud, breach of
contract, breach of fiduciary duty, and conspiracy.  Appellants attack the sufficiency of the
evidence to support the damage awards, the trial court’s determination that
Snodgrass has standing to recover, the finding of Brady’s liability, the
viability and amount of the punitive damage award, and the failure to find that
ERI is liable for unpaid rentals on the building lease.  We affirm in part and, because the evidence
is legally insufficient to support the damage awards, we reverse and render in
part.

 

Background

            Beginning
in 1992, Larry Snodgrass and Mark Swinnea co-owned ERI, an environmental
engineering company.  Much of their work
involved consulting on asbestos abatement projects.  They were also partners in a limited
partnership called Malmeba, which owned the building that ERI leased.  On August 31, 2001, Snodgrass bought out
Swinnea’s interest in ERI.  The document
memorializing the buyout is entitled “Stock Redemption Agreement.”  By virtue of this agreement, ERI repurchased
Swinnea’s five thousand shares of capital stock in ERI for three named items of
consideration:  $497,500.00 cash paid to
Swinnea, transfer to Swinnea of Snodgrass’s ownership interest in Malmeba, and
the right for ERI to purchase certain equipment from Malmeba.  At the same time, the parties signed an
employment contract by which Swinnea agreed to work for ERI for six years.  The contract included a noncompete agreement
in effect for the six year term of the employment contract.  Additionally, ERI entered a lease agreement
with Malmeba to lease the land and building housing ERI for a period of six
years.

            In
the summer of 2001, before the buyout of ERI, Swinnea and Chris Power, another
ERI employee, formed a new company called Air Quality Associates, Inc.
(AQA).  AQA, an abatement contractor,
began bidding on ERI administered asbestos abatement projects.  Snodgrass was unaware that Swinnea and Power
owned AQA until Jeff Shannon of Merico Abatement told him.  Merico, also an abatement contractor, was one
of ERI’s biggest clients but stopped bidding on ERI projects when Snodgrass
refused Merico’s request for ERI to stop accepting bids from AQA.  In February 2002, Power bought Swinnea’s
interest in AQA.

            In
August 2002, about a year after the buyout of Swinnea’s ERI stock, Swinnea’s
wife, Dawn, started a new abatement contracting company, Brady Environmental,
Inc.  Swinnea continued to be employed by
ERI until June 2004, when he was terminated. 
ERI and Snodgrass filed suit against Swinnea and Brady on August 5,
2004, alleging common law fraud, fraud in a stock transaction, breach of
contract, breach of fiduciary duty, and conspiracy.  Swinnea and Brady counterclaimed for breach
of contract and conspiracy.  Malmeba
filed a third party complaint against ERI and Snodgrass for anticipatory breach
of the lease agreement.  ERI moved out of
the Malmeba building September 30, 2004. 
In August 2005, ERI and Snodgrass amended their petition to add a cause
of action for breach of the duty of good faith and fair dealing.

            The
case was tried to the bench.  Among many
other findings, the trial court found that Swinnea breached his fiduciary duty
to Snodgrass and ERI, committed fraud in the context of the buyout, made false
representations of past and existing material facts to induce Snodgrass and ERI
to enter into the buyout, made false promises regarding his performance to
induce Snodgrass and ERI to enter into the transaction, and engaged in a
conspiracy with Brady.  The court also
found that Swinnea must forfeit “unjust profits and gains” he obtained as a
result of his wrongful conduct. 
Therefore, the court found that ERI and Snodgrass were entitled to
recover $133,200.00 for the lease payments of $3,600.00 per month from
September 1, 2001 through September 30, 2004; $437,500.00, a portion of the up
front cash paid in the buyout; $150,000.00 for one half the value of Malmeba;
and $300,000.00 for the loss of income from ERI’s business relationship with
Merico.  The trial court ordered that ERI
and Snodgrass recover those amounts from Swinnea and Brady as actual damages
totaling $1,020,700.00, that Swinnea pay Snodgrass $1,000,000.00 in exemplary
damages, and that Snodgrass and ERI recover 
attorneys’ fees.  The court
ordered that Swinnea, Brady, and Malmeba take nothing on their claims against
Appellees.

 

                                                                        Jurisdiction

            In
their second issue, Appellants assert that there is no evidence that Snodgrass,
rather than ERI, paid any portion of the cash Swinnea received in the buyout or
that Snodgrass had standing to recover the purchase money.  They further argue that Snodgrass did not
have standing individually to recover any loss of Merico income and any such
award would belong solely to ERI.  As the
issue of standing is jurisdictional, we will address this issue out of order. 

            A
plaintiff has standing when it is personally aggrieved, regardless of whether
it is acting with legal authority.  See
Nootsie, Ltd. v. Williamson County Appraisal Dist., 925 S.W.2d 659,
661 (Tex. 1996).  A party has capacity
when it has the legal authority to act, regardless of whether it has a
justiciable interest in the controversy. 
Id.  Standing is
jurisdictional and can be raised for the first time on appeal.  See Texas Ass’n of Bus. v. Texas Air
Control Bd., 852 S.W.2d 440, 445-46 (Tex. 1993).  Capacity is not jurisdictional and may be
waived.  See Nootsie, 925
S.W.2d at 662.

            The
gist of Appellants’ argument is that, because the transaction at issue was the
repurchase by ERI of its own stock, and Snodgrass individually was not a party
to the transaction, he cannot be 

entitled to win damages
individually.  This argument raises the
issue of capacity, not standing.  See Murphy
v. American Rice, Inc., No. 01-03-01357-CV, 2007 Tex. App. LEXIS 2031,
at *44 (Tex. App.–Houston [1st Dist.] March 9, 2007, no pet.); Mackie
v. Guthrie, 78 S.W.3d 462, 465-66 (Tex. App.–Tyler 2001, pet.
denied).  Rule of civil procedure 93(2)
requires a party complaining that a plaintiff is not entitled to recover in the
capacity in which he sues to raise the issue at trial by filing a sworn
affidavit.  Tex. R. Civ. P. 93(2). 
Failure to comply with Rule 93 results in waiver of the right to
complain on appeal about the plaintiff’s capacity.  Nootsie, 925 S.W.2d at
662.  Appellants’ answer does not raise
the issue of capacity, nor is it verified by affidavit.  Appellants have waived the right to raise the
issue of Snodgrass’s capacity.  We
overrule Appellants’ second issue.

 

Standard of
Review

            Findings
of fact entered in a case tried to the court are of the same force and dignity
as a jury’s answers to jury questions.  Anderson
v. City of Seven Points, 806 S.W.2d 791, 794 (Tex. 1991).  The trial court’s findings of fact are
reviewable for legal and factual sufficiency of the evidence to support them by
the same standards that are applied in reviewing the legal and factual
sufficiency of the evidence supporting a jury’s answer to a jury question.  Id.  Conclusions of law will be upheld on appeal
if the judgment can be sustained on any legal theory supported by the evidence;
they will not be reversed unless they are erroneous as a matter of law.  Texas Dep’t of Pub. Safety v. Stockton,
53 S.W.3d 421, 423 (Tex. App.–San Antonio 2001, pet. denied).

            If
an appellant is attacking the legal sufficiency of an adverse finding on an
issue on which he did not have the burden of proof, the appellant must
demonstrate on appeal that there is no evidence to support the adverse finding.  See Croucher v. Croucher, 660
S.W.2d 55, 58 (Tex. 1983). The reviewing court views the evidence in the light
most favorable to the verdict, indulging every reasonable inference that would
support it.  City of Keller v.
Wilson, 168 S.W.3d 802, 822 (Tex. 2005).  The reviewing court must credit evidence that
supports the verdict if a reasonable fact finder could and disregard contrary
evidence unless a reasonable fact finder could not.  Id. at 827.  We must determine whether the evidence at
trial would enable a reasonable and fair minded person to find the facts at
issue.  Id.  A legal sufficiency challenge may be
sustained only when 1) the record discloses a complete absence of evidence of a
vital fact; 2) the court is barred by rules of law or of evidence from giving
weight to the only evidence offered to prove a vital fact; 3) the evidence
offered to prove a vital fact is no more than a mere scintilla; or 4) the
evidence establishes conclusively the opposite of a vital fact.  Uniroyal Goodrich Tire Co. v. Martinez,
977 S.W.2d 328, 334 (Tex. 1998).

Sufficiency
of the Evidence of Actual Damages

            In
their first issue, Appellants contend there is no evidence or factually
insufficient evidence to support the awards of actual damages.  They assert that Appellees did not prove the
value of ERI or the redeemed shares. 
They argue that Appellees failed to present evidence that Appellants’
actions contributed to causing an identifiable loss or improper gain.  Appellants further assert that the evidence
of lost Merico income is speculative.  

            The
trial court found Appellants liable for four separate categories of actual
damages: $133,200.00 for lease payments of $3,600.00 per month from September
1, 2001 to September 30, 2004; $437,500.00, a portion of the up front
cash paid in the buyout; $150,000.00 for one half the value of Malmeba; and
$300,000.00 for loss of income from the business relationship with Merico.  We must consider whether the evidence and the
law support any of the four categories.

Lease Payments

            On
August 31, 2001, the same day the buyout agreement was executed, Malmeba and
ERI entered into a lease agreement.  The
agreement provided that ERI would lease the land and building at 2024 Republic
Drive for six years, beginning September 1, 2001.  The rental rate was to be $3,600.00 per month
for three years and then $3,800.00 per month for the next three years.  Snodgrass personally guaranteed payment of
ERI’s obligations to Malmeba under the lease agreement.  ERI moved out of the Malmeba building on September
30, 2004 and made no rental payments after that date.  Because of Swinnea’s wrongful conduct, the
trial court awarded ERI and Snodgrass $133,200.00 for the $3,600.00 monthly
payments made to Malmeba from September 1, 2001 to September 30, 2004. 

            Snodgrass
testified that he and Swinnea had an oral agreement by which they understood
that the rent was basically another way to compensate Swinnea.  When testifying, Swinnea answered
affirmatively when Appellees’ attorney asked if the lease payments were part of
the consideration for the buyout. 
However, the “Stock Redemption Agreement” listed the “total
consideration” for the purchase of Swinnea’s stock and includes no reference to
lease payments for the use of the Malmeba building.

            The
parol evidence rule prohibits the admission of extrinsic evidence to vary or
explain the  terms or contradict the
legal effect of an unambiguous written instrument in the absence of a showing
of fraud, accident, or mistake in its preparation.  Johnson v. Driver, 198 S.W.3d
359, 363 (Tex. App.–Tyler 2006, no pet.). 
In some instances, parol evidence is admissible to contradict a recital
of consideration in a written instrument. 
See Jackson v. Hernandez, 155 Tex. 249, 251, 285
S.W.2d 184, 185 (1955).  However, when
the consideration expressed in a writing is contractual in nature, and is not
simply a recital of consideration already performed, the parol evidence rule
applies.  Lakeway Co. v. Leon
Howard, Inc., 585 S.W.2d 660, 662 (Tex. 1979).  A previous or simultaneous agreement to alter
the fee agreed upon in a written contract is in conflict with the written
contract and not merely collateral to it. 
Id.  The parol
evidence rule is a rule of substantive law, and testimony admitted in violation
of that rule cannot be considered, even when it is admitted without
objection.  Hubacek v. Ennis State
Bank, 159 Tex. 166, 169, 317 S.W.2d 30, 32 (1958); Wilkins v.
Bain, 615 S.W.2d 314, 315 (Tex. Civ. App.–Dallas 1981, no writ).  Thus, evidence admitted in violation of the
parol evidence rule cannot avoid or change the tenor of the written instrument,
nor will it support a finding of fact by the trial court. Foster v.
Wagner, 337 S.W.2d 485, 492 (Tex. Civ. App.–El Paso 1960), rev’d on
other grounds, 161 Tex. 333, 341 S.W.2d 887 (1960).  Further, it cannot be made the basis of a
finding of fact by an appellate court, nor considered by such court in
determining the sufficiency of the evidence to support the judgment.  Id. 

            Here,
the Stock Redemption Agreement unambiguously set out the total consideration
due to ERI to repurchase Swinnea’s stock. 
The testimony characterizing the Malmeba lease as additional
consideration for the buyout is incompetent parol evidence that cannot support
the trial court’s damage finding.  See
Hubacek, 159 Tex. at 169, 317 S.W.2d at 32.  Accordingly, the trial court erred in
awarding Snodgrass and ERI $133,200.00 to reimburse them for payments made to
rent the Malmeba building from September 1, 2001 to September 30, 2004.   

Up Front Cash, Credit for Value of
Malmeba, and Loss of Income from Merico

            By
the terms of the Stock Redemption Agreement, Swinnea received $497,500.00 in
cash and Snodgrass’s ownership interest in Malmeba, the monetary value of which
was not stated.  The trial court awarded
Snodgrass $437,500.00 as a portion of the up front cash paid and $150,000.00
representing the trial court’s determination of one half the value of
Malmeba.  Additionally, as a separate
actual damage award, the trial court ordered Appellants to pay $300,000.00 for
the loss of income from ERI’s business relationship with Merico.  Applying the appropriate measure of damages,
we must consider whether the evidence supports these awards.

Common Law and Statutory Fraud

            The
trial court found Appellants liable for both common law fraud and statutory
fraud, which  involves a false
representation in a stock transaction.  See
Tex. Bus. & Com. Code Ann. §
27.01(a) (Vernon 2002).  The statute
allows recovery for actual damages, but does not define actual damages.  Tex.
Bus. & Com. Code Ann. § 27.01(b) (Vernon 2002).  In the absence of a statutory definition,
Texas courts generally look to the common law for guidance.  See Quest Med., Inc. v. Apprill,
90 F.3d 1080, 1084 n.4 (5th Cir. 1996). 
The measure of damages recoverable under Section 27.01 is the same as
that under a claim of common law fraud.  Id.  

            Under
common law, there are two measures of damages for fraud, the out of pocket
measure, which is the difference between the value paid and the value received,
and the benefit of the bargain measure, which is the difference between the
value as represented and the value actually received.  W.O. Bankston Nissan, Inc. v. Walters,
754 S.W.2d 127, 128 (Tex. 1988).  Both
measures of damages are determined at the time of the sale.  Arthur Andersen & Co. v. Perry
Equip. Corp., 945 S.W.2d 812, 817 (Tex. 1997).  The “value received” is determined by
evidence of fair market value.  Sobel
v. Jenkins, 477 S.W.2d 863, 868 (Tex. 1972); Morriss-Buick Co. v.
Pondrom, 131 Tex. 98, 100-01, 113 S.W.2d 889, 890 (1938); Broady
v. Mitchell, 572 S.W.2d 36, 42 (Tex. Civ. App.– Houston [1st Dist.]
1978, writ ref’d n.r.e.).  The contract
price is at least some evidence of market value.  Jack Roach Ford v. De Urdanavia,
659 S.W.2d 725, 729 (Tex. App.–Houston [14th Dist.]  1983, no writ).       

Evidence of Damages

            In
his initial proposal, Snodgrass valued ERI at $1,500,000.00.  He valued Malmeba at $300,000.00 based on the
monthly rental rate charged.  Appellants
presented no evidence disputing Snodgrass’s initial valuations.  Snodgrass testified that “what [he] ended up
buying was a pig in a poke.”  He said the
buyout was not a fair deal because Swinnea did not give one hundred percent
after the buyout and he got “very little, if any, value out of the
consideration [he] gave to Mr. Swinnea.” 
When asked how ERI was damaged, he explained that it was damaged because
he relied on Swinnea to provide additional revenue, which he did not
provide.  Snodgrass expected Swinnea to
bring in as much or more income as he had before the buyout.  

            The
record includes ERI’s financial statements for years 2001 through 2004.  Total revenue for ERI’s engineering
department in 2001 was $1,299,561.43. 
After expenses, the net income for the engineering department in 2001
was $14,112.51.  Net income for the
entire company in 2001, including all offices, was $42,948.38.  Total revenue for the engineering department
in 2002 was $1,263,149.91, but it logged in a loss of $416,461.20 that year, in
large part due to abandoned equipment. 
Salaries were 44.15 % of total operating expenses in 2001, but 73.35 %
in 2002.  In addition to salaries, other
operating expenses that were higher in 2002 included business meals,
subscriptions, the employee Christmas party, entertainment, expense allowances,
and travel.  Accompanying the financial
statements for years 2001 through 2003 is a letter from the accounting firm
that compiled the statements explaining that the compilation is limited to presenting
information that is the “representation of management.”  The letter further states as follows:

 

Management has
elected to omit substantially all of the disclosures ordinarily included in
financial statements and supplementary schedules prepared on the income tax
basis of accounting.  If the omitted
disclosures were included in the financial statements, they might influence the
user’s conclusions about the Company’s assets, liabilities, equity, revenues,
and expenses.  Accordingly, these
financial statements are not designed for those who are not informed about such
matters.

 

 

            The
financial statements do not reflect ERI’s liability, equity, value, revenue,
expenses, profits, or losses for August 31, 2001, the day Snodgrass bought
Swinnea’s half of ERI.  While the
financial statements paint a picture, they do not provide the information
necessary for determining the value of ERI. 

            Larry
Boyd, ERI’s controller since September 1, 2001, testified that just after the
buyout, the company had a negative balance of $42,000.00 and was $83,000.00 in arrears.  He did not, however, consider outstanding
accounts receivables in arriving at those figures.  Boyd did not testify as to the value of ERI
at the time of the buyout.  

            Keith
Stiefel, the accountant whose firm prepared most of the financial statements in
evidence, testified that, at the time of the buyout, he felt Snodgrass paid “a
good price” for the company.  He also
answered affirmatively when asked if, considering ERI’s financial records from
the four years after the buyout, he thought the price paid would be a fair
price today.  Steifel, however, did not
testify as to the value of ERI at the time of the buyout.

            One
aspect of valuation is the goodwill of the business.  Goodwill, though intangible, is an integral
part of a business.  Texas &
Pac. Ry. Co. v. Mercer, 127 Tex. 220, 226, 90 S.W.2d 557, 560
(1936).  As property, it may be sold and
it may be damaged.  Id.,
127 Tex. at 225, 90 S.W.2d at 560.  The
rule for measuring such damages is the same as that for measuring damages to
any other property.  Id.,
127 Tex. at 226, 90 S.W.2d at 560. 
Goodwill is generally understood to mean the advantages that accrue to a
business on account of its name, location, reputation, and success.  Taormina v. Culicchia, 355
S.W.2d 569, 574 (Tex. App.–El Paso 1962, writ ref’d n.r.e.).  The value of the goodwill of a business
depends upon the fixed and favorable consideration of customers arising from an
established, well known, and well conducted business.  Id.

            Here,
the testimony showed that ERI is a service business and its success depended on
the strength of Swinnea, Power, and Snodgrass. 
Swinnea testified that the value of ERI was in part the expertise of the
principals, client contacts, and goodwill. 
A distinction can be drawn between the goodwill that attaches to a
professional person because of confidence in the skill and ability of the
individual and the goodwill of a trade or business that arises from its
location or its well established and well recognized name.  Salinas v. Rafati, 948 S.W.2d
286, 290 (Tex. 1997).  However, the
record before us contains no evidence specifying the value of ERI’s goodwill or
the extent to which it was damaged by Swinnea’s actions.  

Out of Pocket Measure

            The
out of pocket measure of damages requires us to consider the difference between
the value paid and the value received.  See
Walters, 754 S.W.2d at 128. 
The out of pocket measure compensates only for actual injuries a party
sustains through parting with something, not loss of profits not yet
realized.  Formosa Plastics Corp.
USA v. Presidio Eng’rs & Contractors, Inc., 960 S.W.2d 41, 49 (Tex.
1998).  Therefore, Appellees cannot
recover for loss of income from ERI’s business relationship with Merico under
the out of pocket measure of damages. 
Snodgrass testified that ERI, at the time of trial, was worth what he
bought it for.  He did not, nor did
anyone else, testify to the value of ERI or its stock at the time of the
buyout.  While the record contains
financial information, it does not contain testimony or documentation showing
the value of ERI, the value of ERI stock, or the value of Malmeba.  The record does not show what, if any,
difference there is between the consideration ERI paid to repurchase Swinnea’s
stock, namely the cash and one half interest in Malmeba as specified in the
Stock Redemption Agreement, and the value ERI received.  Therefore, under the out of pocket measure,
there is no evidence of any actual damages due ERI and Snodgrass arising from
the buyout.  See Wilson,
168 S.W.3d at 827.

Benefit of the Bargain Measure

            The
benefit of the bargain measure requires us to consider the difference between
the value as represented and the value received.  See Walters, 754 S.W.2d at
128.  Consequential damages may be recoverable
if it is shown they are the foreseeable result of the wrong and directly
traceable to it.  Arthur Andersen,
945 S.W.2d at 816.  Consequential damages
could include foreseeable profits from other business opportunities lost as a
result of the fraudulent misrepresentation or nondisclosure.  Formosa Plastics, 960 S.W.2d at
49 n.1.  Under the benefit of the bargain
measure, lost profits that would have been made if the bargain had been
performed as promised may be recovered if proven with reasonable certainty.  Id. at 50.  Lost profits are measured by comparing the
anticipated profits under the fraudulently promised bargain with profits
actually received.  Id.  Determining whether lost profits have been
proved with reasonable certainty is a fact intensive determination dependent
upon the circumstances of a particular case. 
Id. at 50 n.3.  

            Opinions
or lost profit estimates must be based on objective facts, figures, or data
from which the lost profits amount may be ascertained.  Szczepanik v. First S. Trust Co.,
883 S.W.2d 648, 649 (Tex. 1994).  When a
review of the surrounding circumstances establishes that the profits are not
reasonably certain, or lost profit calculations are predicated on unfounded,
speculative assumptions, there is no evidence to support the lost profits
award.  Formosa Plastics,
960 S.W.2d at 50 n.3; Capital Metro. Transp. Auth. v. Central of Tenn.
Ry. & Navigation Co., 114 S.W.3d 573, 579-82 (Tex. App.–Austin
2003, pet. denied).  Anticipated profits
cannot be recovered where they are largely speculative, such as when they are
dependent upon uncertain and changing conditions, including market
fluctuations, or the chances of business, or where there is no evidence from
which they may be intelligently estimated. 
Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.,
877 S.W.2d 276, 279 (Tex. 1994).  

            Snodgrass
considers ERI worth what he paid for it but expected the company to make more
money.  He specifically complained of the
damage to expected Merico income and alleged that Swinnea did not bring in as
much business as Snodgrass had expected. 
In applying the benefit of the bargain measure, keeping in mind that
there can be no recovery for damages which are speculative or conjectural, we
look to the evidence of reasonably certain lost profits to determine what the
value of ERI was on the day of the buyout considering anticipated profits and
business opportunities.  See Apprill,
90 F.3d at 1088-89.

            Power
testified that the loss of Merico resulted in a loss to ERI of $300,000.00 or
$400,000.00 worth of air monitoring business a year.  Appellees presented all invoices for Merico
work from January 2000 to May 2004. 
Accounts receivables for Merico from January 2000 until August 2001 had
a monthly average of $19,833.10. 
Accounts receivables for Merico from September 2001 until May 2004 had a
monthly average of $1,792.59.  Appellees
subtracted the post-buyout accounts receivables from the pre-buyout accounts
receivables to determine a “monthly loss” and then multiplied that by
thirty-three months, claiming a total loss of invoicing revenue of
$595,336.83.  

            When
questioned, Snodgrass admitted this number was based on the total amount billed
to Merico and did not signify a claim of lost profits in that amount.  The benefit of the bargain measure considers
anticipated lost profits, not anticipated lost accounts receivable.  See Formosa Plastics, 960
S.W.2d at 50.  The calculation of lost
profit damages must be based on net profits, not gross revenue or gross
profits.  Holt Atherton Indus.,
Inc. v. Heine, 835 S.W.2d 80, 83 n.1 (Tex. 1992); Turner v. PV
Int’l Corp., 765 S.W.2d 455, 465 (Tex. App.–Dallas 1988), writ
denied per curiam, 778 S.W.2d 865 (Tex. 1989).  When asked what ERI’s usual profit margin is,
Snodgrass explained that a “net number is probably somewhere in the seventy to
eighty percent range.”  He further
explained that “a net, net number probably gets us down to somewhere around 30
to 25 percent.”  Lost profits can be
proven through personal knowledge of the witness.  See White v. Sw. Bell Tel. Co.,
651 S.W.2d 260, 262-63 (Tex. 1983). 
However, thirty percent of $595,336.83 is $178,601.04, which is nowhere
near the $300,000.00 awarded by the court for the “loss of income from their
business relationship with Merico.”  It
does not appear the trial court based the award on Snodgrass’s testimony.

            Swinnea
explained that the Merico/ERI relationship was dual in nature.  As a consultant, ERI invited abatement
contractors, including Merico, to bid on its clients’ jobs.  Additionally, on jobs where Merico was
involved as a contractor, it would invite ERI to bid on the air monitoring
aspect of the job.  He also explained
that, while Merico and ERI had an established working relationship, the Merico
work was not primarily high profit.  By
not doing Merico work, ERI was able to do high profit mold work.

            Power
testified that he thought that, in the long term, the loss of Merico would not
be “the driving force of ERI for the future” because ERI and AQA were focused
on taking care of their clients.  He said
he has worked hard to try to replace the lost Merico work.  However, because Snodgrass does not discuss
the dollar amounts of ERI’s profits with him, he does not know if he has made
up for those losses.

            Jeff
Shannon, project manager for Merico Abatement Contractors, testified about
Merico’s relationship with ERI.  He
explained that, for years, they referred work to each other.  If Merico needed air monitoring, he gave the
job to ERI.  But, if ERI did not quote
them a good price on the job, Merico did not use them.  At one time, Merico got twenty or twenty-five
percent of ERI’s work.  At the time AQA
came into existence, Merico was the only such business in this area.  After he learned that ERI employees were
involved with AQA, Merico’s competitor, he “gave Snodgrass the opportunity to
keep [their] relationship going” by refusing to allow AQA to bid on ERI’s
asbestos projects.  Snodgrass declined to
stop working with AQA, but about a year later, Swinnea started inviting Merico
to bid on jobs again.  By the time of
trial, Merico had started bidding on projects that AQA also bid on.  He testified that Merico had recently gotten
ten percent of the work they bid on for ERI. 
Merico also has a working relationship with three other consulting
companies.  Shannon also stated that he
has done asbestos work for twenty years and the work had steadily decreased.

            While
it is appropriate to consider the amount of profit ERI derived from its past
work with Merico, we must also consider the surrounding circumstances.  See Texas Instruments, 877
S.W.2d at 279.  Merico’s main work was
asbestos abatement.  It is undisputed
that this type of work was decreasing. 
Shannon testified, “[W]e’re all working ourselves out of a job.  There won’t be any asbestos.”  During the time frame at issue, while ERI did
less of this type of work with Merico, it did more with AQA.  There is a finite number of asbestos laden
buildings and their owners can call either AQA or Merico or other such
companies.  There is no evidence of any
particular jobs ERI would have done with Merico but that it did not do because
of any act by Swinnea.  Furthermore,
Shannon testified that Merico could reject an ERI bid if it did not give Merico
a good price.  Eventually, AQA and Merico
were both bidding on work with ERI.  This
laudable application of the free enterprise system contributes further to the
speculative nature of ERI’s claim of lost profits.  

            ERI
did not present evidence of net profits. 
See Holt Atherton, 835 S.W.2d at 83 n.1.  Further, ERI assumed it would enjoy exactly
the same amount of work with Merico after the buyout as it did before the
buyout.  To make that assumption, it had
to assume that all other factors, market, personalities, and otherwise, would
remain the same.  These assumptions were
made in the face of evidence that the business of asbestos remediation was in a
constant state of decline.  ERI’s
anticipated profits are therefore largely speculative.  See Texas Instruments, 877
S.W.2d at 279.  ERI’s lost profit
calculations are no evidence of lost profits because they are predicated on
unfounded, speculative assumptions.  See
Capital Metro. Transp. Auth., 114 S.W.3d at 580-81; SBC
Operations, Inc. v. Business Equation, Inc., 75 S.W.3d 462, 469 (Tex.
App.–San Antonio 2001, pet. denied).  It
has not been shown that a loss of profits is the natural and probable
consequence of Swinnea’s wrongful conduct. 
See Texas Instruments, 877 S.W.2d at 279.  Therefore, the trial court erred in awarding
Appellees $300,000.00 for loss of income from the business relationship with
Merico.  See Szczepanik,
833 S.W.2d at 650.  Moreover, if
Appellees had proven lost Merico profits, that amount should have been incorporated
into the benefit of the bargain equation to determine damages.  It would not constitute a separate award. 

            Further,
while Snodgrass testified that he expected Swinnea to contribute more and
provide additional income which he did not provide, this testimony is merely a
reference to speculation.  While ERI
presented testimony that Swinnea caused it to lose business and that Swinnea
did not bring in as much business as Snodgrass expected, it did not present
specific evidence directly linking Swinnea’s wrongful acts to specific lost
revenue.  See Arthur Andersen,
945 S.W.2d at 816.  Therefore, there is
no evidence of any foreseeable profits from other business opportunities lost
as a result of Swinnea’s actions.  See
Formosa Plastics, 960 S.W.2d at 49 n.1.  Further, Appellees did not establish how much
of that loss, if any, constitutes loss of value of the business occurring at
the time of the sale and how much, if any, was attributable to Swinnea’s later
breach of the employment contract.  See
Arthur Andersen, 945 S.W.2d at 817.

            Returning
to our formula for benefit of the bargain damages, we are to determine the
difference between the value of ERI as represented and the value received.  The value of ERI as represented is what ERI
paid to repurchase Swinnea’s stock in ERI. 
The amount of reasonably certain lost profits proven by Appellees is
zero.  See Formosa Plastics,
960 S.W.2d at 50.  In the absence of lost
profits, there is no evidence that the value received is any different from the
value as represented.  Thus, Appellees
did not prove any actual damages under the benefit of the bargain measure of
damages.  See id.

Breach of Fiduciary Duty/Disgorgement

            The
trial court awarded ERI the sums of $437,500.00, $150,000.00, and $133,200.00
in part as “forfeiture of unjust profits and gains which J. Mark Swinnea
obtained as a result of [his] wrongful conduct.”  Appellants contend that the trial court
misapplied the rule for disgorging windfalls. 
They argue that there is no evidence that Swinnea profited beyond what
would have been expected at the time of the transaction or that any profit was
made illicitly at ERI’s expense. 
Further, they assert that the rule regarding disgorgement contemplates
prevention of unjust enrichment by forcing the return of improper gain, not the
entire consideration received.    

            Appellees
respond that the trial court was justified in ordering the return of any
profits, proceeds, and benefits received as a result of Swinnea’s breach of
fiduciary duty.  They argue in favor of
the “equitable remedy of forfeiture or disgorgement,” citing a variety of cases
including legal malpractice fee forfeiture cases.  We acknowledge that fees collected by a
fiduciary may be forfeited as a result of a breach of fiduciary duty.  See, e.g., Tex. Prop. Code Ann. § 114.008(a)(8) (Vernon 2007) (court may
reduce or deny compensation to trustee to remedy a breach of trust); Burrow
v. Arce, 997 S.W.2d 229, 246 (Tex. 1998) (Upon breach of fiduciary duty
by attorney, forfeiture of attorney’s compensation may be necessary to satisfy
the public’s interest in protecting the attorney-client relationship.).  However, to the extent Appellees assert that
the trial court’s awards are valid based on the equitable remedy of fee
forfeiture, we disagree.  Here, there is
no such fee involved and therefore that line of cases is inapposite.  

            A
plaintiff may be awarded its actual damages for breach of fiduciary duty.  See Duncan v. Lichtenberger,
671 S.W.2d 948, 953 (Tex. App.–Fort Worth 1984, writ ref’d n.r.e.).  In addition to out of pocket damages, a
plaintiff may recover lost profits for a breach of fiduciary duty if proven
with reasonable certainty.  Carr v.
Weiss, 984 S.W.2d 753, 769 (Tex. App.–Amarillo 1999, pet. denied).  Further, a plaintiff may be entitled to
equitable relief and the trial court has discretion to apply an appropriate
equitable remedy.  Int’l Bankers
Life Ins. Co. v. Holloway, 368 S.W.2d 567, 576-77 (Tex. 1963).  For instance, disgorgement is an equitable
remedy by which the wrongdoer is divested of ill gotten gains.  Securities & Exch. Comm’n v.
Huffman, 996 F.2d 800, 802 (5th Cir. 1993).  Thus, a fiduciary must account for, and yield
to the beneficiary, any profit he makes as a result of his breach of fiduciary
duty.  Holloway, 368 S.W.2d
at 576-77.   

            As
explained above, Appellees did not prove any actual damages or reasonably
certain lost profits.  Neither did
Appellees prove that Swinnea obtained any ill gotten gains at ERI’s
expense.  Therefore, there is no evidence
to support an award of damages for breach of fiduciary duty, equitable or
otherwise.  See Martinez,
977 S.W.2d at 334.  Because the evidence
is legally insufficient to support the awards for actual damages, we sustain
Appellants’ first issue.  We need not
address Appellants’ complaint that the evidence is factually insufficient to
support the awards of actual damages.  See
Tex. R. App. P. 47.1.

 

Brady’s
Liability

            In
their third issue, Appellants contend that there is no factual or legal basis
for Brady’s liability.  They argue that
all of the conduct on which the damages are based occurred before Brady was
incorporated and there is no evidence Brady conspired to cause or contributed
to causing any damages to Appellees.  We
agree.

            An
actionable civil conspiracy is a combination by two or more persons to
accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful
means.  Massey v. Armco Steel Co.,
652 S.W.2d 932, 934 (Tex. 1983).  One of
the essential elements of conspiracy is a meeting of the minds on the object or
course of action.  Id.  There must be a preconceived plan and unity
of design and purpose, for the common design is the essence of the
conspiracy.  Schlumberger Well
Surveying Corp. v. Nortex Oil & Gas Corp., 435 S.W.2d 854, 857
(Tex. 1968).

            Swinnea
and Snodgrass signed the buyout agreement on August 31, 2001.  The damage awards are based on Swinnea’s
wrongful conduct with regard to the buyout. 
Brady was incorporated almost a year later, in August 2002.  Inasmuch as Brady did not exist at the time
of the wrongful conduct for which the trial court compensated Snodgrass and
ERI, Brady could not possibly have entered into an agreement with Swinnea
regarding the buyout.  Therefore, there
is no evidence of a meeting of the minds and no evidence of conspiracy between
Swinnea and Brady.  See Massey,
652 S.W.2d at 934.  We sustain Appellants’
third issue.

 

Exemplary
Damages

            In
their fourth issue, Appellants assert that there is no basis for the judgment’s
punitive damage award.  Appellants
contend that there are no recoverable actual damages available to sustain any
exemplary damages.  We agree.  Actual damages are a prerequisite to an
exemplary damage award.  Tex. Civ. Prac. & Rem. Code Ann. §
41.004 (Vernon Supp. 2006); Wright v. Gifford-Hill & Co., 725
S.W.2d 712, 713-14 (Tex. 1987).  Due to
our disposition of Appellants’ first issue, there are no actual damage awards
remaining.  Therefore, the exemplary
damage award cannot stand.  See id.  We sustain Appellants’ fourth issue.

 

Malmeba’s
Cause of Action

            In
their fifth issue, Appellants assert that Malmeba is entitled to judgment for
the unpaid lease payments.  They argue
that ERI has defaulted on its lease with Malmeba and is liable to Malmeba for
the unpaid rentals, utilities, and repairs through September 2005 in the amount
of $53,837.83.

            ERI
moved out of the Malmeba building in September 2004, with three years remaining
on the lease.  Malmeba filed a third
party claim against ERI and Snodgrass for anticipatory breach of the lease
agreement.  Snodgrass testified that ERI
was no longer bound by the lease because of Swinnea’s wrongful conduct.  But, as explained above, the evidence that
the lease was consideration for the buyout is of no probative force.  Hubacek, 159 Tex. at 169, 317
S.W.2d at 32.  Parol evidence may not be
used to connect two different writings; the connections between them must be
evident from the writings themselves.  Foster,
337 S.W.2d at 493.  Thus, there exists an
agreement by which ERI repurchased Swinnea’s stock in ERI and a separate agreement
by which ERI agreed to lease a building from a separate legal entity for a
period of six years.  There is no
evidence that Malmeba breached the lease agreement.  The lease was still in effect on September
30, 2004 when ERI moved out of the Malmeba building and ceased paying rent,
thus breaching the lease.  The lease
provides that upon breach by ERI, Malmeba has a choice of remedies.  It can terminate the lease, take possession
of the building, and expel ERI, or it can take possession of the building, expel
ERI, and relet the building to another lessee.

            Malmeba
sued ERI and Snodgrass for anticipatory breach. 
Under this theory, Malmeba was required to prove the present value of
the rentals to accrue under the lease reduced by the reasonable cash market value
of the lease for the unexpired term.  Austin
Hill Country Realty, Inc. v. Palisades Plaza, Inc., 948 S.W.2d 293, 300
(Tex. 1997); Marshall v. Telecommunications Specialists, Inc.,
806 S.W.2d 904, 907 (Tex. App.–Houston [1st Dist.] 1991, no writ).

            Swinnea
testified that the lease required monthly rental payments of $3,800.00 from the
date ERI moved out until trial and ERI owed $45,600.00 in rent for that twelve
month time period.  Also, ERI was
responsible for taxes, insurance, utilities, and repairs for that time
period.  He testified that the total
damages incurred by Malmeba from the date ERI moved out until the date of trial
was $53,837.83.  He also indicated that
Malmeba asked that “those damages continue to run until” Malmeba can mitigate
its damages.  He explained that as soon
as ERI vacated, he made repairs to the building and listed it with a
realtor.  His attempts to lease or sell
the building had been unsuccessful as of the date of trial.  He also testified that the rental value of
the building was $2,700.00 to $3,000.00 per month at the time of trial. The
record, however, does not contain any evidence of the present value of the
rentals to accrue reduced by the reasonable cash market value for the unexpired
term.

            A
lessor may not recover rent as it accrues, which may be done under the theory
that the lease is in full force and effect, while at the same time recover
damages for the remaining months of the lease under an anticipatory breach
theory.  Speedee Mart, Inc. v.
Stovall, 664 S.W.2d 174, 177-78 (Tex. App.–Amarillo 1983, no
writ).  While we agree ERI defaulted on
the lease, Malmeba brought a cause of action for anticipatory breach but did
not present evidence of damages under that theory.  Accordingly, we sustain Appellants’ fifth
issue to the extent it complains that ERI breached the lease but overrule
Appellants’ fifth issue to the extent they ask for recovery of damages for that
breach.

 

Conclusion

            The
lease executed by Malmeba and ERI cannot be characterized as consideration for
the buyout.  Therefore, the trial court
erred in awarding Snodgrass and ERI $133,200.00 to reimburse them for payments
made pursuant to the lease.  Because
Appellees presented no evidence of actual damages arising out of the buyout, the
trial court erred in awarding them $437,500.00 as a portion of the up front
cash paid, $150,000.00 as one half the value of Malmeba, and $300,000.00 for
loss of income from their business relationship with Merico.  It follows that the awards for exemplary
damages, prejudgment and postjudgment interest, and attorneys’ fees cannot
stand.  See First Am. Title Ins.
Co. v. Willard, 949 S.W.2d 342, 352 (Tex. App.–Tyler 1997, writ denied)
(op. on reh’g); Sam Bradley Realty Co. v. McNair, 644 S.W.2d 533,
536 (Tex. App.–Corpus Christi 1982, no writ). 
We reverse the trial court’s judgment as to these awards
and render judgment that Appellees take nothing on their claims
against Appellants.  

            As
modified, we affirm the trial court’s judgment.

 

 

                                                                                                    SAM GRIFFITH   

                                                                                                               Justice

 

 

 

Opinion
delivered August 30, 2007.

Panel
consisted of Worthen, C.J., Griffith, J., and Hoyle, J.

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

(PUBLISH)